# IN THE SUPREME COURT OF THE STATE OF IDAHO

## Docket Nos. 48784 and 48760

| | | |
|---|---|---|
| In Re: Petition for Writ of Prohibition. | ) | |
| ---------------------------------------------------- | ) | |
| RECLAIM IDAHO, and the COMMITTEE | ) | Boise, June 2021 Term |
| TO PROTECT AND PRESERVE THE | ) | |
| IDAHO CONSTITUTION, INC., | ) | Opinion filed: August 23, 2021 |
| | ) | |
| Petitioner, | ) | Melanie Gagnepain, Clerk |
| | ) | |
| v. | ) | |
| | ) | |
| LAWERENCE DENNEY, in his official | ) | |
| capacity as the Idaho Secretary of State; | ) | |
| and STATE OF IDAHO, | ) | |
| | ) | |
| Respondents, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| SCOTT BEDKE in his official capacity | ) | |
| as Speaker of the House of Representatives | ) | |
| of the State of Idaho; CHUCK WINDER, in | ) | |
| his official capacity as President Pro Tempore | ) | |
| of the Idaho State Senate; SIXTY-SIXTH | ) | |
| IDAHO LEGISLATURE, | ) | |
| | ) | |
| Intervenors-Respondents. | ) | |
| | ) | |
| In Re: Petition for Writ of Mandamus. | ) | |
| ---------------------------------------------------- | ) | |
| MICHAEL STEPHEN GILMORE, a | ) | |
| Qualified Elector of Ada County, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| LAWERENCE DENNEY, Idaho Secretary of | ) | |
| State, in his official capacity, | ) | |
| | ) | |
| Respondent, | ) | |
| | ) | |
| and | ) | |

1

)
**SCOTT BEDKE in his official capacity** )
**as Speaker of the House of Representatives** )
**of the State of Idaho; CHUCK WINDER, in** )
**his official capacity as President Pro Tempore** )
**of the Idaho State Senate; SIXTY-SIXTH** )
**IDAHO LEGISLATURE,** )
)
)
**Intervenors-Respondents.** )

Petition for Writ of Prohibition (Reclaim Idaho v. Denney, Docket No. 48784)

The Petition for Writ of Prohibition is <u>granted in part and denied in part</u>.

Ferguson Durham, PLLC, Boise, for Petitioners. Deborah A. Ferguson argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent Lawerence Denney. Megan Larrondo argued.

Holland & Hart, LLP, Boise, for Intervenors-Respondents Scott Bedke, Chuck Winder and Sixty-Sixth Idaho Legislature. William G. Myers, III, argued.

---

Petition for Writ of Mandamus (Gilmore v. Denney, Docket No. 48760).

The Petition for Writ of Mandamus is <u>dismissed</u>.

Michael Stephen Gilmore, Boise, Petitioner Pro Se, argued.

Lawrence G. Wasden, Idaho Attorney General, Boise, for Respondent Lawerence Denney. Megan Larrondo argued.

Holland & Hart, LLP, Boise, for Intervenors-Respondents Scott Bedke, Chuck Winder and Sixty-Sixth Idaho Legislature. William G. Myers, III, argued.

_____

MOELLER, Justice.

This case concerns the people's referendum and initiative rights, enshrined in Article III, Section 1 of the Idaho Constitution, which reads, in part:

> The people reserve to themselves the power to approve or reject at the polls any act or measure passed by the legislature.
>
> . . .

2

> The people reserve to themselves the power to propose laws, and enact the same at the polls independent of the legislature.
>
> . . .

These same provisions also contain language directing the Idaho Legislature to enact laws establishing the "conditions" and "manner" by which these rights will be exercised. *Id*. Today we are asked to determine whether recent limitations imposed by the Idaho Legislature unconstitutionally infringe upon these rights.

## I.      INTRODUCTION

Two petitions have come before us seeking to invoke the Idaho Supreme Court's original jurisdiction in order to declare two statutes unconstitutional and to issue extraordinary writs—a writ of mandamus and a writ of prohibition. First, Michael Stephen Gilmore ("Gilmore") seeks a declaration that Idaho Code section 34-1805(2), as amended by SB 1110, violates the people's constitutional initiative and referendum rights. SB 1110 requires that, for an initiative or referendum to appear on the ballot, organizers must obtain a threshold number of signatures from "each of the thirty-five (35) legislative districts" in the state. Gilmore argues this violates the equal protection clause of the Idaho Constitution and unconstitutionally divides the people's legislative power. Gilmore also petitions the Idaho Supreme Court for a writ of mandamus ordering the Idaho Secretary of State "not to implement" the statute as amended.

Gilmore's petition is opposed by the Idaho Secretary of State ("the SOS"), who is represented by the Attorney General, as well as the Intervenor-Respondents Scott Bedke, as Speaker of the House of Representatives of the State of Idaho; Chuck Winder, as President Pro Tempore of the Idaho State Senate; and the Sixty-Sixth Idaho Legislature (collectively "the Legislature"),[1] which retained independent counsel. Both the SOS and the Legislature argue that the changes enacted by SB 1110 are a lawful exercise of the legislature's constitutionally-delegated power to prescribe the conditions and manner under which initiatives and referenda may be carried out by the people. The SOS also asserts that Gilmore lacks standing, a writ of mandamus is an improper remedy, original jurisdiction is not warranted, and this case presents a nonjusticiable political question that the Idaho Supreme Court should not address.

---

[1] To avoid confusion, we have capitalized the word "Legislature" in this opinion when referring to the 2021 Idaho Legislature as a party in this case. When generally discussing the role and function of the legislature as a legislative body, it will not be capitalized.

Second, this case consolidates a subsequent petition filed by Reclaim Idaho ("Reclaim") and the Committee to Protect and Preserve the Idaho Constitution, Inc. ("the Committee"), which seeks a declaration that the new signature threshold mandated by SB 1110, requiring signatures from every legislative district, is unconstitutional. They also challenge the constitutionality of another statute, Idaho Code section 34-1813(2)(a), which was amended in 2020 and states that an initiative may not become effective earlier than July 1 of the year following the vote in which it was passed. Reclaim and the Committee contend both amended statutes nullify the people's fundamental constitutional right to legislate directly. They seek a writ of prohibition to prevent the Secretary of State from enforcing these statutory provisions.

Reclaim and the Committee's petition is also opposed by the SOS, as Respondent, and the Legislature, as Intervenors. The SOS and the Legislature again argue that the challenged provisions fall within the legislature's authority granted in Article III, Section 1 of the Idaho Constitution. The SOS adds that a writ of prohibition is an inappropriate remedy and this Court lacks original jurisdiction to hear the petition. The Legislature further contends that the substance of the legislature's conditions on the people's initiative and referendum powers is a nonjusticiable political question.

## II.     BACKGROUND

### A.     Factual Background

In 2021, the Idaho Legislature passed SB 1110, which amended Idaho Code section 34-1805(2), the statute that sets forth the process by which the people exercise their initiative and referendum rights. Governor Brad Little signed SB 1110 into law, but expressed reservations concerning the constitutionality of the legislation. Under the previous law, petition organizers needed to gather signatures from 6% of the total registered voters in the state at the time of the last general election, including 6% of registered voters from each of 18 legislative districts. SB 1110 increased the legislative district requirement to 35 districts—meaning petition organizers must now obtain signatures from 6% of registered voters at the time of the last general election in *every* legislative district in the state. *See* I.C. § 34-1805(2). Because the bill contained an emergency clause, it became effective immediately.

A year earlier, in 2020, Governor Little signed into law a bill amending the second statute at issue in this case, Idaho Code section 34-1813(2)(a). That statute now prevents any initiative approved by voters from taking effect before July 1 of the year following voter approval of the

4

ballot initiative, effectively allowing the legislature six months from when it convenes in January to repeal any voter-passed legislation before it goes into effect. *See* IDAHO CONST. art. III, § 8. The Legislature insists that the amendments to both statutes are within its constitutional authority.

This is a dispute many years in the making. In 1912, the people of Idaho amended the state constitution to "reserve to themselves" initiative and referendum powers. The amendment added a second and third paragraph to Article III, Section 1 of the Idaho Constitution, which defines the legislative power of the state. As amended, this section reads:

> The legislative power of the state shall be vested in a senate and house of representatives. The enacting clause of every bill shall be as follows: "Be it enacted by the Legislature of the State of Idaho."

> The people reserve to themselves the power to approve or reject at the polls any act or measure passed by the legislature. This power is known as the referendum, and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, demand a referendum vote on any act or measure passed by the legislature and cause the same to be submitted to a vote of the people for their approval or rejection.

> The people reserve to themselves the power to propose laws, and enact the same at the polls independent of the legislature. This power is known as the initiative, and legal voters may, under such conditions and in such manner as may be provided by acts of the legislature, initiate any desired legislation and cause the same to be submitted to the vote of the people at a general election for their approval or rejection.

IDAHO CONST. art. III, § 1. The Idaho Constitution reserves to the people the power to legislate directly, while authorizing the legislature to prescribe the "conditions" and "manner" by which the people can do so. *Id.*

In 1915, the legislature passed enabling legislation for the exercise of those powers setting several onerous—if not impossible—conditions for a ballot proposition to qualify for the ballot. For one, the proposed legislation would have required all signatures to be witnessed by a judge or state official. Further, the threshold signature requirement to qualify for the ballot would have been high: 15% of voters in the last gubernatorial election in each of Idaho's counties for initiatives, and 10% in each of Idaho's counties for referenda.[2] Then-Governor Moses Alexander vetoed the bill, writing that it would have been "fatal" to the people's nascent initiative and referendum rights. In response, the legislature set a course of deliberate inaction,

---

[2] As of the end of 1915, Idaho had 37 counties. Extrapolated from public data provided by the State of Idaho at http://www.idaho.gov/aboutidaho/county/index.html .

failing to pass any enabling legislation and allowing the people's initiative and referendum power to remain dormant for another 18 years.

In 1933, the legislature finally acted, passing a law which allowed an initiative or referendum to qualify for the statewide ballot if proponents obtained signatures from 10% of the statewide votes cast in the prior gubernatorial election. That law, which included no geographic distribution requirement for signatures, remained in effect for 64 years—from 1933 until 1997. During that time, 24 initiatives and three referenda qualified for the ballot.[3] In 1984, the legislature again attempted to make the process more onerous, by passing a bill that increased the signature requirement from 10% of the votes cast in the last gubernatorial election to 20%. Then-Governor John Evans vetoed the bill, observing that it would give Idaho "the dubious distinction" of enacting the most restrictive conditions on the initiative power in the nation. As Governor Alexander had before, Governor Evans wrote that the legislature's requirements would make the people's direct legislative power a "dead letter."

Then, in 1997, citing unspecified abuses in the people's use of their direct legislative power—and on the heels of a successful 1994 voter initiative that created term limits[4]—the legislature succeeded in changing the initiative and referendum procedure. The new law required signatures from 6% of *registered* voters, as opposed to persons *qualified* to vote. And, for the first time, those signatures were subject to a geographic distribution requirement: the 6% total signatures gathered from registered voters statewide had to include signatures from 22 of Idaho's 44 counties, equal to 6% of the qualified electors in each county at the time of the last general election. This geographic distribution requirement was later challenged in federal court, and subsequently struck down by the United States Court of Appeals for the Ninth Circuit. *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073 (9th Cir. 2003). The Ninth Circuit concluded that, because Idaho counties have vastly disparate populations, the 22-county requirement violated equal protection and the "one person, one vote" principle by granting more power to those signing petitions in less populous counties. *Id.* at 1078–79. *See generally Gray v. Sanders*, 372 U.S. 368, 381 (1963) ("The conception of political equality from the Declaration of Independence, to Lincoln's Gettysburg Address, to the Fifteenth,

---

[3] Because there are no accurate records from this time period reflecting the number of unsuccessful attempts to qualify an initiative or referendum for the ballot, we cannot accurately determine the percentage that successfully made the ballot.

[4] The term limits initiative passed in 36 of Idaho's 44 counties, with a 59% majority vote.

6

Seventeenth, and Nineteenth Amendments can mean only one thing—one person, one vote."). Thus, the requirement that petition organizers obtain signatures from 6% of registered voters statewide went forward without any geographic distribution requirement. Under this law, which existed unchanged from 1998 to 2013, only four initiatives and four referenda qualified for the ballot out of 63 circulated voter petitions.

Despite the fact that few voter-initiated propositions were making it to the ballot, the legislature again added a more restrictive signature threshold in 2013. This came on the heels of three successful referenda in 2012 that repealed the so-called "Luna Laws"—education legislation that, among other things, limited teachers' ability to negotiate contracts and tied teacher pay to standardized test scores. The Ninth Circuit, in dicta to *Idaho Coal. United for Bears*, had suggested that a geographic distribution requirement based on legislative districts, which are roughly equal in population, would not violate the United States Constitution's equal protection clause. 342 F.3d at 1078; U.S. CONST. amend. XIV. In 2013, the legislature passed just such a geographic distribution requirement, mandating that petition organizers gather signatures from 6% of registered voters at the time of the last general election in each of at least 18 of Idaho's 35 legislative districts, provided that the total number of signatures gathered was equal to or greater than 6% of registered voters statewide at the time of the last general election. The new 18 legislative district requirement remained in place from 2013 until the passage of SB 1110 in 2021. Over the last eight years, 14 voter petitions have been circulated; of those, only two initiatives and no referenda qualified for the statewide ballot.

The two initiatives which qualified under the 18 legislative district requirement both appeared on the ballot in 2018. The first attempt to sponsor an initiative was mounted by Reclaim Idaho, a grassroots, mostly volunteer organization, which sought to expand Medicaid coverage in Idaho ("Medicaid Expansion"). Reclaim exceeded the signature requirement, obtaining signatures from 6% of qualified electors in 21 of Idaho's 35 legislative districts. The second initiative sought to authorize "historic" horse racing in Idaho ("Horse Racing"). Horse Racing relied on paid signature gatherers. This petition also exceeded the signature requirement, obtaining signatures from 6% of the qualified electors in 22 of Idaho's 35 legislative districts. At the polls in November, Medicaid Expansion passed with 60.6% of the statewide vote; Horse Racing failed, garnering only 46.6% statewide support.

7

In 2019, in the immediate aftermath of Medicaid Expansion passing, the legislature again attempted to make qualifying initiatives and referenda more difficult, proposing legislation that would have required signatures from 10% of registered voters statewide at the time of the last general election, including at least 10% of registered voters in 32 of Idaho's 35 legislative districts. *See* H.B. 296 (Idaho 2019); S.B. 1159a (Idaho 2019). Further, the bills would have required all signatures to be gathered in just 180 days, rather than the 18 months previously allowed. However, Governor Little, like Governors Alexander and Evans before him, vetoed the bill, expressing concern about its constitutionality.

The following year, in 2020, the legislature amended one of the two statutes at issue here, Idaho Code section 34-1813(2)(a). The amendment now prevents initiatives from setting an effective date "earlier than July 1 of the year following the vote on the ballot initiative." ID LEGIS 336 (2020), 2020 Idaho Laws Ch. 336 (H.B. 548). Pursuant to Article III, Section 8 of the Idaho Constitution, the legislature convenes annually on the second Monday in January. This means the legislature would have six months to repeal or amend any voter-passed law before it took effect.

Most recently, in 2021, the legislature passed SB 1110, which amended the other statute at issue, Idaho Code section 34-1805(2), by requiring that, to qualify an initiative or referendum for the ballot, organizers must now obtain signatures from 6% of registered voters in "each of the thirty-five (35) legislative districts" in the state, almost doubling the prior geographic distribution requirement. The Legislature correctly notes that the amendment did not change the overall number of signatures needed to qualify for the ballot because both versions of the law still require signatures equal to or greater than 6% of registered voters statewide.

Currently, Reclaim Idaho is working to qualify two initiatives for the 2022 ballot. The first is the "Quality Education Act," which proposes increasing funding for K-12 education in Idaho. On June 16, the Secretary of State approved the Quality Education Act petition for signature gathering. The second is the "Initiative Rights Act," which would eliminate the geographic distribution requirement for initiatives mandated by SB 1110. In declarations submitted to this Court, Reclaim avers that the new signature requirement for qualifying initiatives for the statewide ballot poses an undue burden on an organization made up of volunteers, even if an initiative has broad statewide support.

8

The Committee has also filed a referendum with the Secretary of State seeking to repeal SB 1110, which it is attempting to qualify for the 2022 ballot. They will have 60 days to collect those signatures once the legislature adjourns *sine die*.[5]

**B.      Procedural Background**

On April 26, 2021, Gilmore, a qualified elector from Ada County, filed a verified petition with this Court for issuance of a writ of mandamus to prevent the SOS from implementing Idaho Code section 34-1805(2)'s geographic requirement that signatures obtained for qualifying an initiative or referendum for the ballot must include 6% of registered voters in each of Idaho's 35 legislative districts. The SOS opposed Gilmore's petition. The Legislature sought and was granted permission to intervene, so that it could also oppose the petition.

On May 7, 2021, Reclaim and the Committee filed a verified petition with this Court, naming the SOS as respondent. They seek a declaration that the geographic distribution requirement in Idaho Code section 34-1805(2) violates Article III, Section 1 of the Idaho Constitution, as does Idaho Code section 34-1813(2)(a). They also seek a peremptory writ of prohibition from this Court prohibiting the SOS or any state official from enforcing these provisions. The SOS opposed Reclaim and the Committee's petition. Again, the Legislature was granted permission to intervene, so that it could also oppose this petition. On June 3, 2021, this Court ordered that the two cases be consolidated for the purposes of oral argument and the issuance of this Court's opinion.

On June 2, 2021, the SOS filed a motion to strike certain paragraphs from eight declarations submitted by Reclaim and the Committee. On June 14, 2021, the SOS and the Legislature filed a joint motion to strike two additional declarations submitted by Reclaim and the Committee. On June 21, 2021, we entered an order granting the SOS's motion to strike, in part, as to three of the declarations. We reserved ruling on the objections to the remaining declarations until after oral argument and permitted the SOS to file additional responsive declarations. We afforded Reclaim and the Committee, as well as the SOS, additional time during oral argument to address the outstanding motions.

---

[5] The Idaho Senate adjourned its 2021 legislative session in May; however, the Idaho House of Representatives refused to do so, opting instead to recess to a date no later than December 31, 2021. Thus, the 60-day window for gathering the required signatures for the referendum has not yet commenced.

### III. THE MOTIONS TO STRIKE

Initially, we will address the SOS's and the Legislature's remaining motions to strike. Pursuant to this Court's Order of June 21, 2021, we granted the SOS's motion to strike, in part, by striking portions of the declarations of Linda Larson (paragraph 7), Karen Lansing (paragraph 10), and Jessica Mahuron (paragraphs 8 and 9). We reserved ruling on the SOS's motion to strike portions of the declarations of Ben Ysursa, Luke Mayville, Dr. Gary Moncrief, David Daley, and Robin Nettinga. We also reserved ruling on the SOS's and the Legislature's joint motion to strike the declaration of Joe Champion and the supplemental declaration of Dr. Gary Moncrief.

Idaho Rule of Evidence 602 requires that witnesses have personal knowledge of the evidence of the matter to which they testify. Idaho Rule of Evidence 701 sets forth the standard for opinion testimony from lay witnesses:

> If a witness is not testifying as an expert, testimony in the form of an opinion or inference is limited to one that is:
>
> > (a) rationally based on the witness's perception;
> >
> > (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
> >
> > (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

For expert witness testimony, Idaho Rule of Evidence 702 governs:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

The SOS's motion to strike concerned testimony in the Ysursa, Mayville, Moncrief, Daley, and Nettinga declarations that the SOS claims is speculative as to how the 35 legislative district requirement will affect future signature drives. The SOS asserts these statements are impermissible under Idaho Rule of Evidence 602, 701, and 702. We disagree. These declarants, based on their considerable personal knowledge and experience with the initiative and referendum processes in Idaho, provided both facts and opinion that comply with the requirements of Idaho Rules of Evidence 602, 701, and 702. In sum, the respective expertise of the declarants in these topics permits them to offer such opinions, and we conclude that they were not unduly speculative. In some instances, the SOS's objections appear to go more to the weight of the testimony, but not to its admissibility. This Court is competent to determine the weight we should afford those opinions.

We recently emphasized that, while "[t]he test for determining whether a witness is qualified as an expert is 'not rigid[,]' . . . . [p]ractical experience or special knowledge must be shown to bring a witness within the category of an expert." *Phillips v. E. Idaho Health Servs., Inc.*, 166 Idaho 731, 755, 463 P.3d 365, 389 (2020). Mayville and Moncrief adequately demonstrated their qualifications, experience, and expertise to give expert opinions. Their declarations provided the type of opinions commonly and properly admitted under Idaho Rule of Evidence 702. Contrary to the SOS's assertions, the declarations were not speculative because each addressed opinions upon which an expert in the field can properly opine. Likewise, the remaining declarants provided factual information based on their experience, observations, and personal knowledge.

The SOS also objected to the declarations of Ysursa, Mayville, Moncrief, Daley, and Nettinga, arguing they stated impermissible conclusions of law that were otherwise irrelevant and should be stricken. Moreover, the SOS argues these declarations stated the incorrect constitutional test for this Court to apply in this case. To the extent that any of the declarations contained statements which could arguably be read as legal conclusions, this Court has disregarded such statements as a matter of course. Concerning the balance of the declarations, we find them relevant inasmuch as they contain evidence that has a tendency to make a fact of consequence more or less probable. *See* I.R.E. 401. Accordingly, we deny the balance of the SOS's motion to strike.

The SOS and the Legislature filed a joint motion to strike the declaration of Joe Champion and the supplemental declaration of Dr. Gary Moncrief. The SOS and the Legislature asserted that the declarations were submitted too late for any reply, were unfair to the SOS and the Legislature, and Champion's declaration was too speculative. Typically, a motion to file a supplemental declaration is granted with a showing of good cause. This case, which is being heard as an original action without the benefit of a trial record, presents constitutional issues of significant importance. It is essential that the Court have access to all the relevant facts necessary to reach an appropriate decision. Moreover, the SOS successfully moved this Court to allow a supplemental declaration from its declarant, Dr. John R. Stevens. Therefore, we find there was good cause to admit Reclaim and the Committee's supplemental declarations. There was no unfair prejudice inasmuch as the SOS was allowed to submit its own supplemental declarations. Again, as with the aforementioned declarations, Champion's declaration was the type of opinion commonly and properly admitted under Idaho Rule of Evidence 702. It was not speculative because the declaration addressed opinions upon which an expert in the field can properly opine. Any objections to his methodologies

11

go to the weight, not the admissibility, of his testimony. Therefore, the SOS and the Legislature's outstanding motion to strike the declaration of Champion and the supplemental declaration of Moncrief is also denied.

## IV. STANDING AND JUSTICIABILITY ISSUES

### A. The legal basis for exercising our original jurisdiction

Before proceeding to the merits, we must determine whether the Petitioners have properly invoked this Court's original jurisdiction. We summarized the legal basis for exercising original jurisdiction in a recent case involving the legislature:

> Article V, Section 9 of the Idaho Constitution vests this Court with original jurisdiction to issue writs of mandamus and prohibition, as well as 'all writs necessary or proper to the complete exercise of its appellate jurisdiction.' This original jurisdiction is limited only by the separation of powers provisions contained in Article II, Section 1 of the Idaho Constitution and this Court's own rules. *Mead v. Arnell*, 117 Idaho 660, 663, 791 P.2d 410, 413 (1990). 'Any person may apply to the Supreme Court for the issuance of any extraordinary writ or other proceeding over which the Supreme Court has original jurisdiction.' I.A.R. 5(a). The procedural guidelines over special writs are outlined in Idaho Appellate Rule 5. Once this Court asserts its original jurisdiction, 'it may issue writs of mandamus and/or prohibition.' *Mead*, 117 Idaho at 663–64, 791 P.2d at 413–14.

*Ybarra v. Legislature by Bedke*, 166 Idaho 902, 906, 466 P.3d 421, 425 (2020); *see also Regan v. Denney*, 165 Idaho 15, 19, 437 P.3d 15, 19 (2019). Our case law demonstrates that we have accepted original jurisdiction in matters where "the petition alleges sufficient facts concerning a possible constitutional violation of an urgent nature, . . ." *Sweeney v. Otter*, 119 Idaho 135, 138, 804 P.2d 308, 311 (1990). *See also Idaho Watersheds Project v. State Bd. of Land Commissioners*, 133 Idaho 55, 57, 982 P.2d 358, 360 (1999).

### B. Standards for determining justiciability and standing

A party must present a justiciable controversy in order to invoke the original jurisdiction of this Court and seek declaratory relief. We have been clear: "A prerequisite to a declaratory judgment action is an actual or justiciable controversy. Justiciability is generally divided into subcategories—advisory opinions, feigned and collusive cases, standing, ripeness, mootness, political questions, and administrative questions." *Miles v. Idaho Power Co.*, 116 Idaho 635, 639, 778 P.2d 757, 761 (1989). " 'Concepts of justiciability, including standing, identify appropriate or suitable occasions for adjudication by a court.' " *Coeur d'Alene Tribe v. Denney*, 161 Idaho 508, 513, 387 P.3d 761, 766 (2015) (quoting *State v. Phillip Morris, Inc.*, 158 Idaho 874, 881, 354 P.3d

187, 194 (2015)). As we noted in *Phillip Morris*, this Court has previously explained that a justiciable controversy should be

> distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. . . . The controversy must be definite and concrete, touching the legal relations of the parties having adverse legal interests. . . . It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

158 Idaho at 881, 354 P.3d at 194 (quoting *Davidson v. Wright*, 143 Idaho 616, 620, 151 P.3d 812, 816 (2006)).

Additionally, "[i]t is a fundamental tenet of American jurisprudence that a person wishing to invoke a court's jurisdiction must have standing." *Young v. City of Ketchum*, 137 Idaho 102, 104, 44 P.3d 1157, 1159 (2002). Standing determines whether an injury is adequate to invoke the protection of a judicial decision. *Coeur d'Alene Tribe*, 161 Idaho at 513, 387 P.3d at 766. Standing is a threshold determination by this Court before reaching the merits of the case. *Phillip Morris*, 158 Idaho at 881, 354 P.3d at 194. "The inquiry 'focuses on the party seeking relief and not on the issues the party wishes to have adjudicated.' " *Id.* (quoting *Young*, 137 Idaho at 104, 44 P.3d at 1159). This Court has historically looked to the United States Supreme Court for guidance on issues of standing. *Id.* " '[T]he origin of Idaho's standing [rule] is a self-imposed constraint adopted from federal practice, as there is no "case or controversy" clause or an analogous provision in the Idaho Constitution as there is in the United States Constitution.' " *Regan*, 165 Idaho at 21, 437 P.3d at 21 (quoting *Coeur d'Alene Tribe*, 161 Idaho at 513, 387 P.3d at 766) (citing U.S. CONST. art. III, § 2, cl. 1).[6]

---

[6] We recognize the criticism the Court has received in the past, including that contained in the concurring opinion, for allegedly departing from common law standing principles, dating back to Idaho's early statehood, by adopting federal standing principles in *Bear Lake Education Ass'n v. Bd. of Trustees of Bear Lake Sch. Dist. No. 33*, 116 Idaho 443, 448, 776 P.2d 452, 457 (1989). *See* Michael S. Gilmore, *Standing Law in Idaho: A Constitutional Wrong Turn,* 31 IDAHO L. REV. 509 (1995); *Zeyen v. Pocatello/Chubbuck Sch. Dist. No. 25*, 165 Idaho 690, 705-08, 451 P.3d 25, 40-43 (2019) (Stegner, J., dissenting). However, notwithstanding his noted law review article on this topic, Gilmore does not argue for this Court to reassess its standing principles and revert to common law standing principles. In fact, Gilmore cites the federal standing principles adopted by this Court—injury in fact, causal connection, and redressability—and argues their applicability to his case. Therefore, the concept of judicial restraint would suggest that this Court not address an issue that was not raised: " '[t]he premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them.' " *State v. Chambers*, 166 Idaho 837, 847, 465 P.3d 1076, 1086 (2020) (Brody, J., concurring) (quoting *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983)). Therefore, notwithstanding the persuasive arguments of the concurring opinion, this case simply does not present a compelling reason for "leaving behind thirty years of jurisprudence on standing."

13

"[T]o establish standing 'a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a like[lihood] that the injury will be redressed by a favorable decision.' " *Phillip Morris*, 158 Idaho at 881, 354 P.3d at 194 (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014). To satisfy the first element—an injury in fact—one must "allege or demonstrate" an injury that is " 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* (quoting *Susan B. Anthony*, 573 U.S. at 157–58). The common phrase "allege or demonstrate" used by this Court "is an incomplete statement of the requirements for standing." *Id.* This Court clarified in *Young* that the standing phrase "allege or demonstrate" actually "requires a showing of a '*distinct palpable injury*' and 'fairly traceable causal connection between the claimed injury and the challenged conduct.' " *Young*, 137 Idaho at 104, 44 P.3d at 1159 (emphasis added) (quoting *Miles*, 116 Idaho at 639, 778 P.2d at 761). "Palpable injury" has been defined by this Court as "an injury that is easily perceptible, manifest, or readily visible." *Phillip Morris*, 158 Idaho at 881, 354 P.3d at 194.

The bar for standing can vary with the circumstances of each individual case. *Id.* at 882, 354 P.3d at 195. It is admittedly "imprecise and difficult to apply." *Young*, 137 Idaho at 104, 44 P.3d at 1159. However, we have remained steadfast to the premise that "standing can never be assumed based on a merely hypothetical injury." *Phillip Morris*, 158 Idaho at 882, 354 P.3d at 195 (citing *Young*, 137 Idaho at 104, 44 P.3d at 1159). Thus, bare allegations are insufficient. *Id.* Furthermore, " 'a citizen and taxpayer may not challenge a governmental enactment where the injury is one suffered alike by all citizens and taxpayers of the jurisdiction.' "[7] *Noh v. Cenarrusa*, 137 Idaho 798, 800, 53 P.3d 1217, 1219 (2002) (quoting *Miles*, 116 Idaho at 641, 778 P.2d at 763). A petitioner must " 'establish a peculiar or personal injury that is different than that suffered by any other member of the public.' " *Id.* (quoting *Selkirk-Priest Basin Ass'n v. State*, 128 Idaho 831, 834, 919 P.2d 1032, 1035 (1996)).

### C. Gilmore's petition fails to raise a justiciable claim.

---

[7] This Court has recognized the U.S. Supreme Court's narrow exception regarding taxpayer standing. " 'Taxpayers have been held qualified to maintain an action to test the validity of a statute or ordinance which increases the tax burden. Generally cases so holding involve an alleged illegal expenditure of public money.' " *Koch v. Canyon Cnty.*, 145 Idaho 158, 161, 177 P.3d 372, 375 (2008) (quoting *Greer v. Lewiston Golf & Country Club, Inc.*, 81 Idaho 393, 397, 342 P.2d 719, 722 (1959)). "[T]his Court has never questioned the standing of a taxpayer to challenge expenditures that allegedly violate Article VIII, § 3." *Id.* at 162, 177 P.3d at 376. Neither Gilmore nor Reclaim Idaho has cited *Koch* as authority this Court should apply—and probably for good reason. These petitions do not involve governmental expenditures, allegations that any expenditures violate Article VIII, § 3, or argument that the parties have standing through the taxpayer exception challenging expenditure of public money.

### 1. *Gilmore does not meet the requirements for standing.*

The SOS asserts that Gilmore lacks standing for this Court to hear his petition. The SOS argues Gilmore's alleged injury is generalized in that SB 1110 affects Gilmore in an identical fashion to all other Idahoans. We agree with the SOS's assessment and conclude that Gilmore lacks standing because he has failed to present a " 'peculiar or personal injury that is different than that suffered by any other member of the public.' " *Noh*, 137 Idaho at 800, 53 P.3d at 1219 (quoting *Selkirk-Priest*, 128 Idaho at 834, 919 P.2d at 1035).

In *Young*, plaintiffs filed a complaint against the City of Ketchum for declaratory relief and a writ of prohibition regarding the City's involvement in a professional services contract and a related lease. *Young*, 137 Idaho at 103, 44 P.3d at 1158. The City entered into a contract with the Sun Valley-Ketchum Chamber of Commerce ("Chamber"), which provided that the Chamber would provide tourist information to the public and marketing services to promote the area. *Id.* In consideration of the services provided, the City was required to pay the Chamber money, which was raised via the local option nonproperty tax.[8] *Id.* A group of plaintiffs, consisting of concerned citizens who resided in and paid property taxes to the City, unsuccessfully challenged the contract in district court. *Id.* On appeal to this Court, we held that the plaintiffs lacked standing.

Plaintiffs alleged they suffered a distinct and palpable injury as concerned citizens and property owners living in the city. *Id.* at 105, 44 P.3d at 1160. The plaintiffs complained:

> (1) the option tax expenditures attract visitors and second homeowners to the area, which in turn has driven up the value of land and increased the amount they pay in property taxes; (2) the option tax is not actually paid by local businesses, but are paid by both residents and visitors; and (3) the City raised cash to make payments to the Chamber by reducing option tax expenditures for basic government functions . . . .

*Id.* This Court rejected the plaintiffs' assertions, reasoning that their alleged injury is more akin to an indirect effect that all citizens and taxpayers in the City share. We noted that none of the plaintiffs were business owners. *Id.* Therefore, the Court held, "Plaintiffs have made no allegations that such an injury is any different or distinct from any other citizen or property owner in the Ketchum area. This is insufficient to confer standing." *Id.*

Gilmore points to this Court's opinion in *Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 15 P.3d 1129 (2000), in support of his assertion that he meets the standing requirements.

---

[8] This was essentially a municipal sales tax.

In *Van Valkenburgh*, petitioners sought a writ of prohibition and a declaratory judgment to prevent the Secretary of State from carrying out any action regarding a new ballot initiative—"The Congressional Term Limits Pledge Act of 1998" ("Term Limits Act"). *Id*. at 123, 15 P.3d at 1131. The Term Limits Act required the Secretary of State to place information on ballots for voters on whether a particular Congressional candidate had taken or broken a term limits pledge. Petitioners alleged that the law violated their right to vote because it "greatly diminishes the likelihood the candidate of their choice will prevail in the election." *Id.* at 123–25, 15 P.3d at 1131–33. The State, defending the Term Limits Act, argued the petitioners' injury is no different from the injury suffered by any other Idaho citizen. *Id.* However, the Court rejected the State's argument and agreed with the petitioners, reasoning:

> We believe the Petitioners have met the requirement of demonstrating a distinct injury because they have alleged I.C. § 34-907B adversely impacts only those registered voters who oppose the term limits pledge, or who support candidates who oppose the term limits pledge. Those who support the specific term limits pledge contained in the law are not injured by the use of the ballot legend, and it in fact benefits those who support the term limits pledge by increasing the likelihood their candidate will be elected.

*Id.* Accordingly, this Court found the petitioners alleged an injury not suffered by all citizens and taxpayers alike, thus they had standing. *Id.*

Gilmore's reliance on *Van Valkenburgh* is misplaced. Gilmore argues he is akin to the petitioners in *Van Valkenburgh* because: (1) he has established an injury in fact—SB 1110 diminishes the chance that hypothetical, future initiatives and referenda Gilmore might support will ever make it to the ballot; and (2) his injury is not an injury suffered by all citizens of Idaho—SB 1110 only negatively impacts those who are opposed to it.

First, it is certainly true that SB 1110 may diminish the chance an initiative or referendum Gilmore supports makes it to the ballot in the future; however, Gilmore's claimed injury is based on pure conjecture. Gilmore suggests that all Idahoans do not share his injury because SB 1110 only makes it harder for Idahoans like Gilmore, who may support a hypothetical future initiative or referendum, to qualify it for the ballot; whereas, it causes no injury to those who would oppose a hypothetical future initiative or referendum. Gilmore's analogy is too speculative and generalized. Gilmore has not identified any initiative or referendum he *currently* supports, which SB 1110 makes more difficult to qualify for the ballot. Gilmore merely alleges that it will be harder for initiatives and referenda he *might* support in the future to reach the ballot because of SB 1110.

16

Simply put, while Gilmore has shown that he is personally vexed by the passage of SB 1110, he has not effectively demonstrated that he currently has a dog in this fight. The Court's analysis might be different had Gilmore demonstrated his participation in a pending initiative or referendum drive in Idaho. Here, however, Gilmore can only claim that there might be some hypothetical initiative or referenda in the future that he desires to support, which SB 1110 may prevent from qualifying for the ballot.

Second, Gilmore further claims that he has standing because he is in a class of injured Idahoans that is unique: those who generally favor initiatives and referenda. Gilmore asserts that SB 1110 does not injure those opposed to "citizen legislation" because it aligns with their core values—it only injures those who favor it. Gilmore's distinction is creative, but if this Court were to adopt his view, it would essentially grant standing to almost every citizen that opposes any newly passed law. It is hardly a stretch to assume that almost every bill passed by the legislature has an opponent somewhere who feels personally aggrieved, yet standing requires more than mere disappointment. In comparison, the Term Limits Act in *Van Valkenburgh* did not affect all citizens in Idaho equally. It made it more difficult for specific candidates and their supporters who oppose term limits pledges to be successful in the next election. This is an actual and discernible injury.

For example, if the legislature enacted a new law that capped Idaho's speed limit to a maximum of 55 miles per hour statewide, some may be opposed to the law and some may favor it. However, would citizens in the former group have standing to challenge the law in court based solely on their personal disagreement with the legislature's action? Likely no, because standing is rooted in the injury suffered by the party challenging the law, not whether the party is merely opposed to the law on principle. To have standing, an opponent of the new speed limit would at least have to demonstrate a "distinct and palpable" injury related to the speed limit change, such as an Uber driver or a commercial trucking firm whose livelihoods were adversely affected by the change, in order to make an arguable case for standing.[9] *See Miles*, 116 Idaho at 639, 778 P.2d at 761.

Here, Gilmore's proposed distinction is too similar to the hypothetical above. Just because Gilmore favors citizen legislation and SB 1110 impedes citizen legislation, Gilmore argues he has standing. This is not a proper basis for standing. Mere disagreement with a law is not sufficient to establish standing. Gilmore fails to meet the test set forth by this Court in *Phillip Morris* by

---

[9] This is not to say that there may not be other significant impediments to bringing such a case.

17

pointing to a "distinct and palpable injury" that he has suffered and is unique to him, and one "that is easily perceptible, manifest, or readily visible." *Phillip Morris*, 158 Idaho at 881, 354 P.3d at 194. Aside from his argument that SB 1110 makes it generally more difficult for all initiatives and referenda to qualify for the ballot, Gilmore cannot point to an injury personal to him that is "concrete and particularized." *Id*. (quoting *Susan B. Anthony*, 573 U.S. at 157–58). Therefore, we conclude that Gilmore lacks standing.

### 2. *Gilmore's petition does not meet the requirements for relaxed standing.*

Over the last few decades this Court has relaxed traditional standing requirements in order to hear cases involving alleged constitutional violations that would otherwise go unaddressed because no one could satisfy traditional standing requirements. *See, e.g., Coeur d'Alene Tribe*, 161 Idaho 508, 387 P.3d 761; *Regan*, 165 Idaho 15, 437 P.3d 15. Where petitioners have not met the traditional standing requirements, we have nevertheless held that we may " 'exercise jurisdiction to review a petition for extraordinary relief where the petition alleges sufficient facts concerning a possible constitutional violation of an urgent nature.' " *Coeur d'Alene Tribe*, 161 Idaho at 513, 387 P.3d at 766 (quoting *Idaho Watersheds Project*, 133 Idaho at 57, 982 P.2d at 360).

To qualify for relaxed standing, one still must show: (1) the matter concerns a significant and distinct constitutional violation, *and* (2) no party could otherwise have standing to bring a claim. *Id.* Here, Gilmore essentially raises the same issues as Reclaim and the Committee. However, inasmuch as we hold below that Reclaim and the Committee have demonstrated they have standing, Gilmore's argument for us to exercise relaxed standing is undermined because he can no longer meet the second prong of our relaxed standing test—that *no other party* could have standing to bring a claim. Therefore, because Reclaim and the Committee have shown that they are parties with proper standing before this Court, Gilmore does not meet the relaxed standing requirements for this Court to hear his petition.

### D. Reclaim and the Committee have raised justiciable claims and have demonstrated that this Court should exercise original jurisdiction over their petition.

The SOS contends that Reclaim and the Committee lack standing because their alleged injuries are speculative, arguing it is unclear whether Reclaim and the Committee will have problems qualifying their future initiatives of referenda for the ballot under SB 1110. Furthermore, both the SOS and the Legislature contend that the issues raised in Reclaim and the Committee's petition lack the urgency necessary to trigger original jurisdiction. The SOS asserts that Reclaim and the Committee should ask a district court for a preliminary injunction or a temporary

18

restraining order because this case involves inherently factual questions and, therefore, there should be discovery, depositions, testimony, and cross-examination. Moreover, they argue that Reclaim and the Committee have plenty of time to collect signatures for a referendum because the time to collect signatures has not begun because the House has not yet adjourned *sine die*. Finally, the Legislature asserts that Reclaim and the Committee raise a purely political question that this Court should not entertain.

### 1. *Reclaim and the Committee satisfy the requirements of standing.*

As noted above, "to establish standing 'a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a like[lihood] that the injury will be redressed by a favorable decision.' " *Phillip Morris*, 158 Idaho at 881, 354 P.3d at 194 (quoting *Susan B. Anthony*, 573 U.S. at 157–58). The SOS only challenges the first element of standing—an injury in fact. To satisfy the requirement of an injury in fact, one must "allege or demonstrate" an injury that is " 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.' " *Id.* (quoting *Susan B. Anthony*, 573 U.S. at 157–58). Standing "requires a showing of a 'distinct palpable injury' and 'fairly traceable causal connection between the claimed injury and the challenged conduct.' " *Young*, 137 Idaho at 104, 44 P.3d at 1159 (quoting *Miles*, 116 Idaho at 639, 778 P.2d at 761).

Here, we find Reclaim and the Committee have met the burden of demonstrating injury in fact. Reclaim has demonstrated that it is currently sponsoring two initiatives for the ballot in 2022. Likewise, the Committee has a proposed referendum approved by the SOS awaiting the Idaho House of Representatives adjournment *sine die*. Because SB 1110 increases the burden on both petitioners to qualify their proposed initiatives and referendum for the ballot, it results in a distinct and palpable injury in fact. While it is yet to be seen whether SB 1110 will preclude either from qualifying their matters for the 2022 ballot, the fact that the legislature has placed a significantly greater burden for getting their petitions certified for the ballot is clear. Petitioners would now have to obtain 6% of the registered voter's signatures in all thirty-five legislative districts, instead of the previous requirement of eighteen. Thus, Reclaim and the Committee have shown a particularized injury; one that is "fairly traceable" to SB 1110. Therefore, they have met their burden to establish standing before this Court.

### 2. *The urgent and important circumstances of this case justify the Court exercising its original jurisdiction to consider whether to issue a writ of prohibition.*

19

A writ is an extraordinary remedy that cannot be granted where an adequate remedy in the ordinary course of law already exists. *Leavitt v. Craven*, 154 Idaho 661, 665, 302 P.3d 1, 5 (2012); *Wasden ex rel. State v. Idaho State Bd. of Land Comm'rs*, 150 Idaho 547, 551–52, 249 P.3d 346, 350–51 (2010). One seeking a writ of prohibition must show two contingencies are met: "[(1)] 'the tribunal, corporation, board or person is proceeding without or in excess of the jurisdiction of such tribunal, corporation, board, or person, and [(2)] that there is not a plain, speedy, and adequate remedy in the ordinary course of law.' " *Wasden*, 150 Idaho at 551–52, 249 P.3d at 350–51 (quoting *Henry v. Ysursa*, 148 Idaho 913, 915, 231 P.3d 1010, 1012 (2008)).

The SOS asserts that a writ of prohibition is inappropriate because Secretary of State Denney is not exceeding his powers in any way since he did not enact the statutory provisions. However, we have issued a writ of prohibition against the Idaho Secretary of State under similar circumstances in the past to prevent him from acting pursuant to an unconstitutional statute. *See Van Valkenburgh*, 135 Idaho at 124, 15 P.3d at 1132 (noting review was urgent due to a deadline imposed on the Secretary of State and issuing a writ of prohibition prohibiting the Secretary of State from carrying out term limits pledge directions from I.C. § 34-907B on the ballot). *See generally Sweeney v. Otter*, 119 Idaho at 138, 804 P.2d at 311 (accepting jurisdiction because "the petition alleges sufficient facts concerning a possible constitutional violation of an urgent nature" and deciding whether the Lieutenant Governor could break a tie in Senate leadership elections); *Keenan v. Price*, 68 Idaho 423, 429, 195 P.2d 662, 664 (1948) (accepting jurisdiction because of the "importance of the question[] presented" and the "urgent necessity for immediate determination").

Even if there is another remedy in the ordinary course of law in the trial courts, this Court has recently stated, "[o]ur willingness to act upon our original jurisdiction includes cases requiring a determination of the constitutionality of recent legislation where there is 'urgency of the alleged constitutional violation and the urgent need for an immediate determination.' " *Ybarra*, 166 Idaho at 906, 466 P.3d at 425 (quoting *Regan*, 165 Idaho at 21, 437 P.3d at 21). For example, in *Coeur d'Alene Tribe*, the Senate and the House of Representatives passed SB 1011, which repealed a law that allowed wagering on "historical" horse races. 161 Idaho at 511, 387 P.3d at 764. About a week later, then Governor C.L. "Butch" Otter vetoed the bill. *Id.* Senate officials filed letters that stated because the Governor's veto came after the five-day constitutional deadline, SB 1011 became law before the veto took effect. *Id.* at 512, 387 P.3d at 765. The Senate nevertheless called a vote to

override the veto, but did not receive enough votes. *Id.* The President of the Senate sustained the Governor's veto and declared that SB 1011 failed to become law. *Id.* The Tribe requested the Secretary of State to certify it as law, which the Secretary of State refused. *Id.* The Tribe then petitioned this Court for a writ of mandamus ordering the Secretary of State to certify SB 1011 as law. *Id.*

This Court initially concluded that the petitioner failed to "provid[e] facts to show actual or imminent losses of profit or rights greater than the average citizen, the [petitioner] has not demonstrated a 'distinct and palpable' injury sufficient to confer standing." *Id.* at 513, 387 P.3d at 766 (quoting *Troutner v. Kempthorne*, 142 Idaho 389, 391, 128 P.3d 926, 928 (2006)). Yet, this Court noted that it may nonetheless " 'exercise jurisdiction to review a petition for extraordinary relief where the petition alleges sufficient facts concerning a possible constitutional violation of an urgent nature.' " *Id.* (quoting *Idaho Watersheds Project*, 133 Idaho at 57, 982 P.2d at 360). Under this relaxed requirement, this Court determined that one need not show a special injury to himself or his property in order to petition for mandamus. *Id.* at 514, 387 P.3d at 767. Specifically, the Court held that if (1) the matter concerns a significant and distinct constitutional violation, and (2) no party could otherwise have standing to bring a claim, it is willing to relax ordinary standing requirements. *Id.* Examining the petitioner's claim under this standard, this Court held that the case concerned a significant and distinct constitutional violation (if the petitioner's allegations were taken as true), and no other party would have standing to bring the petition, or the willingness to do so. *Id.* Therefore, this Court applied relaxed traditional standing requirements and heard the petitioner's writ. *Id.* at 514–15, 387 P.3d at 767–68.

Likewise, in *Regan*, the petitioner asserted that Idaho Code section 56-267, a statute enacted directly by the people through the same initiative power at issue here, had violated Idaho's Constitution by delegating future lawmaking authority regarding Medicaid expansion to the federal government. 165 Idaho at 17, 437 P.3d at 17. This Court noted that " 'a citizen and taxpayer may not challenge a governmental enactment where the injury is one suffered alike by all citizens and taxpayers of the jurisdiction.' " *Id.* at 21, 437 P.3d at 21 (quoting *Noh*, 137 Idaho at 800, 53 P.3d at 1219). The petitioner conceded that he could not satisfy the traditional standing requirements. *Id.* Yet, this Court, relying on *Coeur d'Alene Tribe*, relaxed the traditional requirements because of the urgent nature of the alleged constitutional violation. *Id.* (noting the 90-day requirement in the new law for the Department to submit the necessary plan amendments

21

created an urgent need to hear the case immediately). *But see Regan* 165 Idaho at 29–33, 437 P.3d at 29–33 (Brody, J., concurring in part and dissenting in part) (Moeller, J., concurring in part and dissenting in part). Here, if we take the allegations in Reclaim and the Committee's petition as true, "there is 'urgency of the alleged constitutional violation and the urgent need for an immediate determination.' " *Ybarra*, 166 Idaho at 906, 466 P.3d at 425 (quoting *Regan*, 165 Idaho at 21, 437 P.3d at 21). This case presents an issue of a vital and urgent constitutional nature. Both Reclaim and the Committee are attempting to qualify initiatives and a referendum for the 2022 ballot. The legislature's actions amounted to a one-two punch for groups like Reclaim and the Committee— it passed a law that made the initiative and referendum process more difficult for proponents of future ballot propositions, while simultaneously making it more difficult for those opposed to the new law to pass a referendum to repeal that very law.

The SOS argues that because there is no urgency for this Court to address the petition, the matter should begin at the district court level. However, SB 1110 contains its own emergency clause that enacted it as soon as the Governor signed it. *See* IDAHO CONST. art. III, § 22; I.C. § 67-510. By its wording, this began the short, 60-day period for a referendum to circulate in all 35 legislative districts to obtain the 6% of registered voters' signatures necessary for the referendum to appear on the ballot. *See Regan*, 165 Idaho at 21, 437 P.3d at 21 (exercising original jurisdiction, in part, because of the urgent nature of the alleged constitutional violation and the short timeline in the new law for the Department to submit the necessary plan amendments). By comparison, previous referenda had eighteen months to garner 6% of the registered voters' signatures in the then-required 18 legislative districts. Because it is unknown when the Idaho House of Representatives will adjourn *sine die*, there is great uncertainty as to when that 60-day period will begin. This will clearly hamper the organizational efforts of groups like the Committee who have a referendum already filed with the SOS. Accordingly, we conclude that Reclaim and the Committee have properly invoked our original jurisdiction to decide this matter.

### 3. *Reclaim and the Committee's petition does not present a purely political question.*

The Legislature contends that Reclaim and the Committee's petition presents a nonjusticiable political question that this Court should not entertain because it "would be substituting its judgment for that of another coordinate branch of government, when the matter was one properly entrusted to that other branch." *Miles*, 116 Idaho at 639, 778 P.2d at 761.

This is an argument we have addressed before, and one that the United States Supreme Court resolved long ago. We have previously recognized that " '[i]t is emphatically the province and duty of the judicial department to say what the law is.' " *Nye v. Katsilometes*, 165 Idaho 455, 463, 447 P.3d 903, 911 (2019) (quoting *Marbury v. Madison*, 5 U.S. 137, 177 (1803)). "Passing on the constitutionality of statutory enactments, even enactments with political overtones, is a fundamental responsibility of the judiciary, and has been so since *Marbury v. Madison*." *Miles*, 116 Idaho at 640, 778 P.2d at 762. Interpretation of constitutional or statutory provisions is a "familiar judicial exercise." *Zivotofsky ex rel. Zivotofsky v. Clinton*, 556 U.S. 189, 196 (2012).

The assertion that this case is nonjusticiable because it poses a political question "is akin to the political question abstention doctrine of the federal court system which is outlined in *Baker v. Carr*, 369 U.S. 186 (1962). However, as presented here, the issue is more correctly viewed under the doctrine of separation of powers, which is embraced in art. 2 § 1 of the Idaho Constitution." *Miles*, 116 Idaho at 639, 778 P.2d at 761. We have turned to and relied upon the considerations in *Baker* when addressing such questions in the past. *Id.*; *see also Idaho State AFL-CIO v. Leroy*, 110 Idaho 691, 718 P.2d 1129 (1986). "[J]udicial action must be governed by standard, by rule, and must be principled, rational, and based upon reasoned distinctions found in the Constitution or laws." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2507 (2019) (italics omitted, internal quotation marks and citation omitted). One indication that a case raises a political question is the lack of "judicially discoverable and manageable standards" available to the Court to resolve the question. *Leroy*, 110 Idaho at 695, 718 P.2d at 1133. Another would be a case where this Court is asked to take sides on a purely ideological matter, as opposed to a legitimate legal or constitutional question. *See, e.g., Regan*, 165 Idaho at 32–33, 437 P.3d at 32–33, (Moeller, J., concurring in part and dissenting in part) ("[Petitioner's] arguments are largely ideological and dogmatic in nature—not legal—and demonstrate that the intent behind the petition is to have this Court redefine the proper role of federalism in Idaho. In sum, this Court is not really being asked to address an urgent constitutional issue created by the passage of [Medicaid expansion]; rather, Regan is asking this Court to take sides in an ideological debate concerning political philosophy."). While there is admittedly a political component to almost any controversial subject the legislature addresses, the issue presented here is not purely political—it is predominantly a legal and constitutional question that this Court may and properly should answer.

The Legislature relies on the U.S. Supreme Court's recent opinion in *Rucho*, which concerned the issue of partisan gerrymandering. The Court held that it presented a nonjusticiable political issue under the federal constitution. 139 S. Ct. at 2493–2508. The Court noted that gerrymandering is a hyper-political process: "Partisan gerrymandering claims rest on an instinct that groups with a certain level of political support should enjoy a commensurate level of political power and influence." *Id.* at 2499. Essentially, the Court reasoned that such cases "ask the courts to make their own political judgment about how much representation particular political parties *deserve*—based on the votes of their supporters—and to rearrange the challenged districts to achieve that end." *Id.* (emphasis in original). The Court struggled with a "legal standard[] discernible in the Constitution for making such judgments, let alone limited and precise standards that are clear, manageable and politically neutral." *Id.* at 2500. Therefore, it declined to hear the issue, holding, "we have no commission to allocate political power and influence in the absence of a constitutional directive or legal standards to guide us in the exercise of such authority." *Id.* at 2508.

This Court has addressed similar initiative and referendum issues before. *See, e.g., Dredge Mining Control-Yes!, Inc. v. Cenarrusa*, 92 Idaho 480, 445 P.2d 655 (1968); *Gibbons v. Cenarrusa*, 140 Idaho 316, 92 P.3d 1063 (2002) (finding the legislature could immediately repeal a voter-passed initiative by declaring an emergency); *Luker v. Curtis*, 64 Idaho 703, 136 P.2d 978 (1943) (holding that the legislature can repeal an initiative passed by the people). In *Dredge Mining*, this Court reviewed a statutory requirement that required signatories of an initiative to be a legal voter, among other requirements. *Id.* at 481, 445 P.2d at 656. In its analysis, this Court held that, "[t]he statutory scheme set up by the legislature, although restrictive and perhaps cumbersome, is reasonable and workable." *Id.* at 484, 445 P.2d at 659. Whether this Court continues to follow the "reasonable and workable" standard laid out by *Dredge Mining* will be discussed below, but for purposes of this discussion, it is clear this Court has been able to address such issues before.

*Rucho* is distinguishable because this case concerns the constitutionality of specific statutes enacted by the legislature, rather than the inherently political exercise of dispersing political power, such as in the case of gerrymandering. Judicial review of these statutes does not raise a purely political question. "[A]pplying well-settled legal principles to an unsettled question of law . . . is a judicial function almost as old as our republic." *Nye*, 165 Idaho at 463, 447 P.3d at 911. The

24

Legislature correctly notes that this Court is asked to determine "at what point does permissible conditioning of initiatives and referenda to ensure statewide support become unconstitutional?" However, this question does not require us to engage in any sort of political calculus. Rather, it requires this Court to focus on the statute enacted and determine whether it is constitutional as amended. While there are undoubtedly political undertones to this case, this Court need not address such concerns in exercising its fundamental responsibility to (1) "say what the law is" and (2) resolve the overarching constitutional issues raised by Reclaim and the Committee concerning the statutes in question. *Marbury*, 5 U.S. at 177; *Miles*, 116 Idaho at 640, 778 P.2d at 762.

## V.    CONSTITUTIONAL ISSUES

We begin our constitutional analysis by recognizing that under the Idaho Constitution, "*All* political power is inherent in the people." IDAHO CONST. art. I, § 2 (emphasis added). Moreover, it is a fundamental principle that the people, in adopting the Idaho Constitution, instituted the government to do their will. *See id.* Here, the legislature has passed a law (I.C. § 34-1805(2)) making it undeniably more difficult for the people to qualify an initiative or referendum for a statewide vote and another (I.C. § 34-1813(2)(a)) effectively granting the legislature time to repeal any initiative passed by a majority of the state's voters before it ever takes effect. The question before this Court is whether the legislature has acted within its delegated power to prescribe the "conditions" and "manner" for the people's exercise of direct legislative power, or whether it has exceeded its power. Thus, the Idaho Supreme Court is called upon to act in its role as the final arbiter of the meaning of the Idaho Constitution, to give effect to that meaning, and to protect against encroachments on the people's constitutionally enshrined power. For the reasons set forth below, we conclude that the Legislature has acted beyond its constitutional authority and violated the people's fundamental right to legislate directly.

**A.    The initiative and referendum powers reserved in the Idaho Constitution are fundamental rights.**

As previously noted, Article III, Section I of the Idaho Constitution establishes the legislative powers for the state of Idaho, including the power of direct legislation by the people:

> The legislative power of the state shall be vested in a senate and house of representatives. The enacting clause of every bill shall be as follows: "Be it enacted by the Legislature of the State of Idaho."

> *The people reserve to themselves the power to approve or reject* at the polls any act or measure passed by the legislature. This power is known as the referendum,

and legal voters may, *under such conditions and in such manner as may be provided by acts of the legislature*, demand a referendum vote on any act or measure passed by the legislature and cause the same to be submitted to a vote of the people for their approval or rejection.

*The people reserve to themselves the power to propose laws, and enact the same* at the polls *independent of the legislature*. This power is known as the initiative, and legal voters may, *under such conditions and in such manner as may be provided by acts of the legislature*, initiate any desired legislation and cause the same to be submitted to the vote of the people at a general election for their approval or rejection.

IDAHO CONST. art. III, § 1 (emphasis added).

This Court has consistently recognized that "a right is fundamental under the Idaho Constitution if it is expressed as a positive right, or if it is implicit in Idaho's concept of ordered liberty." *Van Valkenburgh*, 135 Idaho at 126, 15 P.3d at 1134 (citing *Idaho Sch. For Equal Educ. Opportunity*, 123 Idaho 573, 581–82, 850 P.2d 724, 732–33 (1993); *Simpson v. Cenarrusa,* 130 Idaho 609, 615, 944 P.2d 1372, 1378 (1997)). *Van Valkenburgh* dealt with the right to vote and held that voting was a fundamental right "because the Idaho Constitution expressly guarantees the right of suffrage." *Id.* We have not previously applied this test to the people's direct legislative power. However, like voting, the Idaho Constitution plainly expresses the initiative and referendum power as a positive right—*"The people reserve to themselves the power . . . ."* IDAHO CONST. art. III, § 1. This alone requires us to interpret the people's initiative and referendum rights as fundamental rights.

The SOS and the Legislature ask us to read the initiative and referendum provisions of the Idaho Constitution as merely defining a power that is subject to total control by the legislature. We do not agree. In interpreting the Idaho Constitution, the rules of statutory construction apply. *Rudeen v. Cenarrusa*, 136 Idaho 560, 567, 38 P.3d 598, 605 (2001) ("The general rules of statutory construction apply to constitutional provisions as well as statutes."). These rules of construction are well understood:

The objective of statutory interpretation is to derive the intent of the legislative body that adopted the act. Statutory interpretation begins with the literal language of the statute. Provisions should not be read in isolation, but must be interpreted in the context of the entire document. The statute should be considered as a whole, and words should be given their plain, usual, and ordinary meanings. It should be noted that the Court must give effect to all the words and provisions of the statute so that none will be void, superfluous, or redundant. When the statutory language is unambiguous, the clearly expressed intent of the legislative body must be given effect, and the Court need not consider rules of statutory construction.

26

*In Re Doe*, 168 Idaho 511, ___, 484 P.3d 195, 200 (2021) (internal quotations omitted). An ambiguous statutory or constitutional provision is one where reasonable construction of the language can result in more than one meaning. *Id.* In that instance, this Court must engage in statutory construction in order to determine and give effect to the legislative intent. *Id.*

Analyzing the nature of the initiative/referendum power requires us to reconcile a tension in the language of the constitutional provision. Article III, Section 1 establishes and defines the people's power to legislate directly, stating, *"The people reserve to themselves the power . . . ."* But it also provides that the exercise of this power is to be carried out *"under such conditions and in such manner as may be provided by acts of the legislature . . . ." Id*. The SOS and the Legislature aver that the conditions and manner phrasing controls, thereby establishing the ultimate authority of the legislature to place boundaries around initiatives and referenda. Reclaim and the Committee argue that the people's right predominates. They insist the conditions and manner language only entrusts the legislature with providing a process through which the people can exercise their reserved right—not suppressing it.

A close reading of Article III, Section 1 convinces us that it establishes the people's fundamental right to legislate directly, as opposed to a power that is subservient to the will of the legislature. The conditions and manner provisions do not grant the legislature *carte blanche* in limiting that right. First, the referendum and initiative powers are described within the section of the constitution that establishes legislative power. Along with the power granted to the legislature, the initiative and referendum rights are "*reserved*" to the people. "To ascertain the ordinary meaning of an undefined term in a statute [or constitution], we have often turned to dictionary definitions of the term." *Marek v. Hecla, Ltd*., 161 Idaho 211, 216, 384 P.3d 975, 980 (2016). *Merriam-Webster* defines "reserve" as to "hold in reserve" or "keep back." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, *Reserve* (10th Ed. 1993). As applied here, the people kept back for themselves a portion of the total legislative power they granted to the House of Representatives and the Senate. The SOS and Legislature's perspective—that the legislature has the authority to limit the people's initiative and referendum rights, even to the point of near extinction—is simply not supported by the straightforward reservation of a portion of the total legislative power to the people in the Idaho Constitution.

Second, we must give full effect to the phrase "*independent of the legislature*," which appears in the paragraph on initiatives. The first sentence of the initiatives paragraph reads,

27

"The people reserve to themselves the power to propose laws, and enact the same at the polls *independent of the legislature*." IDAHO CONST. art. III, § 1 (emphasis added). The SOS urges us to read this phrase as describing only the people's freedom to determine the *subject matter* of initiative-based laws. According to the SOS, if the power itself were intended to be independent of the legislature, then it would have also appeared in the paragraph on referenda, which is otherwise the linguistic parallel of the initiatives paragraph. Therefore, the SOS argues, it must mean the opposite: that everything *except* the subject matter of initiatives is dependent on the legislature.

However, there are two significant flaws with this reasoning. First, and most basically, a referendum is a constitutional mechanism allowing the people to repeal a law already passed by the legislature. By its very nature, it cannot be "independent of the legislature" because it is a response to legislative action. This is a simple enough explanation as to why the phrase "independent of the legislature" does not appear in the referenda paragraph, and a far more self-evident explanation than the one offered by the SOS, which would require us to bend the meaning of the entire initiative and referendum power around an inference about an omission. Second, the language describing the people's initiative right is not limited to its subject matter. The paragraph on initiatives begins: "The people reserve to themselves the power *to propose laws, and enact the same* at the polls independent of the legislature." What is reserved is expressly the power *to propose* laws and *to enact* laws—verbs closely associated with the act of legislating and not just choosing the subjects of legislation. The SOS would have us read into the provision a phrase that is not there—"subject matter"—and ignore what is otherwise plainly stated. We see no need to strain for an interpretation when the plain language of the Idaho Constitution is clear: the people have the power to propose and enact laws on any subject. This power is both equivalent to that of the legislature and one which the people possess "independent of the legislature."

The conditions and manner language, on the other hand, does not provide authority to the legislature beyond defining the *process* by which initiatives and referenda are qualified for the ballot. For example, in the initiatives paragraph, the language appears as follows:

> This power is known as the initiative, and legal voters may, *under such conditions and in such manner as may be provided by acts of the legislature*, initiate any desired legislation and cause the same to be submitted to the vote of the people at a general election for their approval or rejection.

28

IDAHO CONST. art. III, § 1 (emphasis added). The conditions and manner language for initiatives comes between the words "may" and "initiate," thus qualifying that verb phrase— i.e., legal voters *may initiate* any desired legislation, but that process of *initiation* is subject to legislated conditions and manner. The interpretation is identical for the paragraph related to referenda. There, the conditions and manner language comes between "may" and "demand," thus qualifying that the legislature may place conditions on and determine the manner by which voters *may demand* a referendum. Both "initiate" and "demand" relate to the procedures by which an initiative or referendum, respectively, may be pursued. The legislature's conditions and manner authority plainly relate to the *process* of direct legislation. Thus, while the legislature may determine *how* the people's right to legislate is initiated, it has not been given the power to effectively prevent the people from exercising this right by placing onerous conditions on the manner of its use.

The SOS and the Legislature maintain that the initiative and referendum power cannot be a fundamental right if the right is not "self-executing," but instead relies on the legislature to enact the processes which give the right effect. For support, they point to the history of the initiative and referendum powers—that after the constitutional amendment enshrining these powers was passed in 1912, the legislature did not pass enabling legislation for more than twenty years,[10] thwarting the constitutional amendment passed by the people. This is flawed and troubling logic. Simply because the legislature failed to act does not mean they were justified in doing so, nor does it signal that the drafters of the amendment intended to give the people an impotent and illusory power.

More persuasively, we look to the number of other important rights which, like the initiative and referendum powers, are considered fundamental even though the legislature has the authority to set conditions or procedures related to the right. For example, the right to vote is a fundamental right because the Idaho Constitution expressly guarantees the right to suffrage. *Van Valkenburgh*, 135 Idaho at 126, 15 P.3d at 1134 (citing IDAHO CONST. art. I, § 19) ("No power, civil or military shall at any time interfere with or prevent the free and lawful exercise of the right of suffrage."). While it is true that Article VI, Section 4 of the Idaho Constitution provides for the legislature's ability to "prescribe qualifications, limitations, and conditions for

---

[10] While the 1915 legislature passed enabling legislation, Governor Alexander vetoed the law because the severe requirements would have been "fatal" to the initiative and referendum power.

the right of suffrage . . . ," this does not mean the Idaho legislature could, notwithstanding the Twenty-sixth Amendment, constitutionally limit the franchise by raising the voting age from 18 to 35. Similarly, the legislature is permitted to place conditions on certain aspects of free speech. *See, e.g., State v. Sanchez*, 165 Idaho 563, 569, 448 P.3d 991, 997 (2019) (holding that statutes criminalizing threats against public servants is within the "wide range of conduct" that the state has the "power to prohibit"). The ability of the legislature to make laws related to a fundamental right arises from the reality that, in an ordered society, few rights are absolute. However, the legislature's duty to give effect to the people's rights is not a free pass to override constitutional constraints and legislate a right into non-existence, even if the legislature believes doing so is in the people's best interest.

Therefore, because the people of Idaho expressly "reserve[d] to themselves the power[s]" to (1) "approve or reject at the polls any act or measure passed by the legislature," and (2) "propose laws and enact the same … independent of the legislature," when they amended the Idaho Constitution in 1912, we conclude these powers are fundamental rights. Accordingly, while the legislature has authority to define the processes by which these rights are exercised, any legislation that effectively prevents the people from exercising these rights will be subject to strict scrutiny, as explained below.

## B. Because Idaho's initiative and referendum powers are fundamental rights, any effort to limit those rights is subject to strict scrutiny.

The proper constitutional standard to be applied when reviewing legislation that impacts the people's initiative and referendum rights is a matter of first impression. In *Van Valkenburgh*, we held without qualification that a law infringing on a fundamental right is subject to strict scrutiny:

> [I]f a fundamental right is at issue, the appropriate standard of review to be applied to a law infringing on that right is strict scrutiny. Under the strict scrutiny standard of review, a law which infringes on a fundamental right will be upheld only where the State can demonstrate the law is necessary to promote a compelling state interest.

135 Idaho at 126, 15 P.3d at 1134 (internal citations omitted). We have already concluded that, like the right to vote, the people's right to legislate is expressed as a positive right in the Idaho Constitution and is, therefore, fundamental. *See id.* Because our fundamental rights jurisprudence is unequivocal that such rights are subject to strict scrutiny, that is the standard we must apply here.

30

The SOS and the Legislature ask us to apply a lower standard of scrutiny based on reasoning from *Dredge Mining*, where we held that the legislature has the authority to require a process to verify and certify that signatures come from registered voters because those requirements fall within the conditions and manner language of Article III, Section 1 of the Idaho Constitution. 92 Idaho at 483, 445 P.2d at 658. In so ruling, we acknowledged that the procedures for the initiative and referendum power are not self-executing, and we described the legislature's signature verification and certification requirements as being, among other things, "reasonable and workable":

> The statutory scheme set up by the legislature, although restrictive and perhaps cumbersome, is *reasonable and workable*. Changes designed to make it less restrictive and burdensome in its operation are for the legislature to enact. The trial court did not err in its conclusion of law that the provisions of the law enacted by the legislature pertaining to the initiative procedures are reasonable.

*Id.* at 484, 445 P.2d at 659 (emphasis added; internal citations omitted). The SOS and the Legislature now claim that *Dredge Mining* established a "reasonable and workable" standard for analyzing legislative acts which affect the direct legislation process.[11]

We disagree that *Dredge Mining* established the applicable legal standard for scrutinizing legislative acts for a simple reason: we did not apply a fundamental rights analysis in *Dredge Mining*. The focus of our analysis was on giving effect to language in Article VI, Section 2 of the Idaho Constitution to conclude that a "legal voter" is one who is registered to vote. *Id.* at 482–83, 445 P.2d at 657–58. Next, we affirmed the language of the trial court that the legislature's procedures for verifying that signatures came from registered voters were "not unreasonable" and

---

[11] The SOS and the Legislature would have us read *Dredge Mining* as providing a standard akin to the rational basis standard. However, if *Dredge Mining's* "reasonable and workable" language were to be read as a legal standard, it is closer to the "undue burden" standard employed recently by the Utah Supreme Court. *See Count My Vote, Inc. v. Cox*, 452 P.3d 1109, 1118 (Utah 2019); *Utah Safe to Learn-Safe To Worship Coal., Inc. v. State*, 94 P.3d 217, 226 (Utah 2004). The Utah Supreme Court has recognized that state's initiative and referendum powers are fundamental rights. However, that court also observed, "This right, though fundamental under our state constitution, is not unfettered, but comes with a built-in limitation." *Id.* at 226. To that end, the court employed a flexible standard:

> [A] court should assess whether a legislative "enactment is reasonable, whether it has a legitimate legislative purpose, and whether the enactment reasonably tends to further that legislative purpose." And in "evaluating the reasonableness of the challenged enactment and its relation to the legislative purpose," we have said that "courts should weigh the extent to which the right of initiative is burdened against the importance of the legislative purpose."

*Count My Vote*, 452 P.3d at 1118 (internal citations omitted). The Utah Supreme Court described the "undue burden" standard as being similar to its "minimal scrutiny" standard but "more exacting." *Id.* at 1118. However, this standard has yet proved to be workable inasmuch as that court acknowledged that it had not yet determined the "manner and means" by which a party could establish the "nature and extent" of the burden on the initiative right, nor how this was to be weighed against the legislative purpose. *Id.* at 1118–19.

31

were "workable." *Id.* at 483, 445 P.2d at 658. We were simply not called upon to engage in the same type of constitutional analysis in *Dredge Mining* that we must engage in here—*i.e.*, first determining the nature of the right at stake and then arriving at an appropriate level of scrutiny. Rather, *Dredge Mining* focused on cases dealing with the State's police power, a governmental power not invoked by any party in this case.[12] The case before us is different because the initiative and referendum powers retained by the people are expressed in the Idaho Constitution as fundamental rights.

Additionally, we note that strict scrutiny is a well-established standard where fundamental rights are concerned. It is a standard which exists within a significant body of case law from both the Idaho Supreme Court and the United States Supreme Court to guide us in its application. The "reasonable and workable" standard preferred by the dissent has not been applied as a standard of constitutional review since *Dredge* in 1968 and we would be breaking new legal ground if we suddenly applied it now. In fact, it is far from clear how such a standard would be applied. On the other hand, the standard for strict scrutiny is clear: "Strict scrutiny should be applied to legislation dealing with fundamental rights or suspect classifications. Strict scrutiny requires that the government action be necessary to serve a compelling state interest, and that it is narrowly tailored to achieve that interest." *Bradbury v. Idaho Jud. Council*, 136 Idaho 63, 69, 28 P.3d 1006, 1012 (2001) (internal citations omitted). *See also Van Valkenburgh*, 135 Idaho at 126, 15 P.3d at 1134 ("Under the strict scrutiny standard of review, a law which infringes on a fundamental right will be upheld only where the State can demonstrate the law is necessary to promote a compelling state interest."). Thus, strict scrutiny is the measuring stick that must be applied to the statutes in question.

**C. Idaho Code section 34-1805(2), which requires a threshold amount of signatures from all 35 legislative districts, is unconstitutional.**

---

[12] In *Dredge Mining*, this Court further concluded that when a statute is "reasonable and workable," it is the purview of the legislature to make additional changes that will "make it less restrictive and burdensome in its operation …" *Dredge Mining,* 92 Idaho at 484, 445 P.2d at 659. Notably, the cases cited in support of this assertion all deal with the state's police power—a power to act with broad authority to ensure the public health, safety, and welfare of its citizens. *See Messerli v. Monarch Memory Gardens, Inc.*, 88 Idaho 88, 96, 397 P.2d 34, 39 (1964) (regarding the constitutionality of a statute protecting against fraud in contracts for funerary services and body disposal); *Johnston v. Boise City*, 87 Idaho 44, 52, 390 P.2d 291, 295 (1964) (regarding eminent domain and compensation); *Berry v. Koehler*, 84 Idaho 170, 176, 369 P.2d 1010, 1013 (1961) (regarding a statute defining the practice of dentistry). The need for the state's police power has not been invoked here by the SOS or the Legislature. Even if it had, it would not be possible to conclude that the Legislature's actions have made the initiative and referenda process "less restrictive and burdensome in its operation."

*1.* ***Requiring signatures from all 35 legislative districts does not promote a compelling state interest.***

The SOS avers that Idaho Code section 34-1805(2) survives strict scrutiny because "the state has an 'important regulatory interest' in ensuring an initiative petition has a modicum of statewide support before it is placed on the ballot." According to the SOS, the amended statute (1) protects the state by ensuring the ballot is not inundated with localized legislation and (2) increases voter involvement and voter inclusivity across the entire state. The stated purpose of SB1110 is: "to increase voter involvement and inclusivity in the voter initiative/referendum process." Thus, given the fundamental right at stake, we must determine whether SB 1110's stated purpose identifies a compelling state interest.

To begin, we look to the history of how the legislature has previously exercised its conditions and manner authority. Since we have described this history in detail above, we will briefly summarize it here. In 1912, following the amendments to Article III, Section 1 of the Idaho Constitution, the legislature had the duty to pass enabling legislation for the people's newly enshrined initiative and referendum rights. The legislature eventually passed an enabling act in 1915, but it was so restrictive that then Governor Alexander vetoed it. Thus, the legislature's failure to provide reasonable procedures meant that the people's rights to propose initiatives and referenda lay dormant for more than twenty years. Finally, in 1933, the legislature set the signature requirements simply at 10% of the statewide votes cast in the prior gubernatorial election. This remained the requirement for 64 years, and during this time only 24 initiatives and three referenda qualified for the ballot. In 1984, the legislature attempted to double the number of signatures needed to qualify initiatives and referenda for the ballot to 20%. However, then Governor Evans, just as Governor Alexander had before him, vetoed the legislation because it appeared bent on rendering the initiative and referendum power a "dead letter."

From 1994 to 2012, the people twice succeeded in passing or repealing significant legislation at the polls—the 1994 initiative creating term limits, and the 2012 repeal of education legislation known as the "Luna Laws." Both times the legislature responded by placing new, more difficult requirements on the process for qualifying voter-based petitions. In 1997, the legislature created a 22-county geographic distribution requirement for signatures, which was subsequently struck down by the Ninth Circuit for violating equal protection principles. *Idaho Coal. United for Bears,* 342 F.3d at 1079. Over the next fifteen years (1998-2013), when the signature requirement was simply 6% of registered voters statewide, only four

33

initiatives and four referenda qualified for the ballot out of 63 voter petitions circulated. In 2013, following the repeal of the "Luna Laws," the legislature again adopted a geographic distribution requirement, this time based on legislative districts of roughly equal population size, which the Ninth Circuit had suggested would not violate the Equal Protection Clause. *See id.* at 1078 ("Idaho could achieve the same end through a geographic distribution requirement that does not violate equal protection, for example, by basing any such requirement on existing state legislative districts."). This legislation mandated that the signatures of the requisite 6% of registered voters statewide include 6% of registered voters as of the last general election in at least 18 of Idaho's 35 legislative districts.

Over the next eight years, until the passage of SB 1110 in 2021, only 14 voter petitions were circulated. Of those, just two initiatives and no referenda qualified for the statewide ballot. In 2018, despite years of opposition by the legislature, voters passed one of those initiatives: legislation which expanded access to Medicaid. Medicaid Expansion passed with widespread support, garnering over 60% of the vote statewide, including majority votes in 35 out of Idaho's 44 counties. The following year, the legislature passed stricter requirements for obtaining signatures, which were later vetoed by Governor Little. And again, in 2021, the legislature passed an even stricter geographic requirement, SB 1110, which Governor Little signed despite noting concerns about its constitutionality.

We approach the present legislation from this historical context—one which shows an unmistakable pattern by the legislature of constricting the people's initiative and referendum powers after they successfully use it. At oral argument, the Legislature repeatedly asserted that this was necessary to prevent the minority from being "trammeled by the majority." We acknowledge, as James Madison argued in the Federalist Papers, one advantage of a republican form of government over a direct democracy is that it may provide greater protection to minority interests. *See* THE FEDERALIST NO. 10 (James Madison). Nonetheless, the United States Supreme Court has recognized that state constitutional "[p]rovisions for referendums demonstrate devotion to democracy, not to bias, discrimination, or prejudice." *James v. Valtierra*, 402 U.S. 137, 141 (1971). Here, the SOS and the Legislature have offered no supporting evidence of a compelling need to further restrict the people's initiative and referendum power in order to protect minority interests. In short, they have failed to demonstrate how minority rights have been "trammeled" by the initiative process in Idaho. It

is difficult to find, as the SOS and the Legislature suggest, that there is a realistic threat that the interests of any group of Idaho citizens are currently at risk due to the initiative process previously in effect when (1) so few initiatives or referenda have even qualified for the ballot in the last 109 years, and (2) the legislature still possesses the authority to repeal initiatives once passed, as they have done before. In fact, no actual or perceived threat to minority interests necessitating SB 1110's signature requirement has been identified by the legislature. The most recent examples—the referenda overturning the "Luna Laws" in 2012 and the Medicaid Expansion initiative in 2018—actually may have been examples of the majority of Idaho voters acting in a democratic fashion to *protect* minority interests (educators and the poor) when the Idaho Legislature would not.

In the end, should the protection of minority rights have been the aim of the legislature in enacting further restrictions on the initiative and referendum process, we recognize that there already exists a mechanism in place to perform this function, as former United States Supreme Court Justice Robert Jackson adroitly explained:

> The very purpose of a Bill of Rights was to withdraw certain subjects from the vicissitudes of political controversy, to place them beyond the reach of majorities and officials and to establish them as legal principles to be applied *by the courts*. One's right to life, liberty, and property, to free speech, a free press, freedom of worship and assembly, and other fundamental rights may not be submitted to vote; *they depend on the outcome of no elections*.

*W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943) (emphasis added). Protecting the constitutional rights of both the majority and the minority is not only a vital role of the judicial branch, it is also one that judicial officers throughout Idaho are accustomed to performing on a daily basis. Indeed, the judiciary's role in adjudicating the constitutionality of legislative acts was recognized prior to final adoption of the United States Constitution:

> If it be said that the legislative body are themselves the constitutional judges of their own powers, and that the construction they put upon them is conclusive upon the other departments, it may be answered, that this cannot be the natural presumption, where it is not to be collected from any particular provisions in the Constitution. *It is not otherwise to be supposed, that the Constitution could intend to enable the representatives of the people to substitute their WILL to that of their constituents. It is far more rational to suppose, that the courts were designed to be an intermediate body between the people and the legislature, in order, among other things, to keep the latter within the limits assigned to their authority.* … A constitution is, in fact, and must be regarded by the judges, as a fundamental law. It therefore belongs to them to ascertain its meaning, as well as the meaning of any particular act proceeding from the legislative body.

35

THE FEDERALIST NO. 78, at 492 (Alexander Hamilton) (B. Wright ed. 1961) (emphasis added). Importantly, just as the courts have the constitutional authority to exercise judicial review over the enactments of the legislature, it logically follows that the judiciary has a concomitant power to review direct legislation enacted by the people. *See, e.g., Regan*, 165 Idaho at 22, 437 P.3d at 22. Such review not only provides a sturdy bulwark for protecting the rights of both the majority and the minority,[13] but it also, as Hamilton concluded, is the "proper and peculiar province of the courts." THE FEDERALIST NO. 78, at 492.

Additionally, the SOS and the Legislature insist that the 35 legislative district requirement is justified because it assures that voter-initiated legislation that qualifies for the ballot has a "modicum of statewide support." To prove this, they point to the same two initiatives that qualified for the ballot in 2018. Both initiatives—Medicaid Expansion and Horse Racing—were required to present signatures from 6% of qualified electors statewide, including 6% of qualified electors as of the last general election in at least each of 18 legislative districts. *See* I.C. § 34-1805 (2013). The SOS points out that both initiatives qualified for the ballot without first demonstrating support in all areas of the state. ("Historical Horse Racing did not obtain a qualifying number of signatures in any legislative district in Northern Idaho, while Medicaid Expansion did not obtain sufficient signatures in legislative districts in the midsection of the state."). Thus, the SOS claims, Idaho Code section 34-1805(2)'s requirement that petitioners obtain a qualifying number of signatures in each of Idaho's 35 legislative districts "provides a system of checks and balances for direct legislation, which creates a check on the will of the majority."

We see little evidentiary or logical support for the position that the state has a compelling interest in ensuring that initiatives and referenda demonstrate a threshold level of support in *every* legislative district before qualifying for the ballot. For example, there is simply no logical reason why a ballot proposition supported by 6 percent of the voters in 34 out of 35 legislative districts has not clearly established that it has statewide support. More importantly, the suggestion that the proponents of a ballot proposition must demonstrate "a modicum of statewide support" just to qualify for the ballot is simply inapposite to the inherent purpose of Article III, Section 1's initiative and referendum power, which is to give the majority of the people an opportunity to have

---

[13] For an assessment of how the courts have acted as check on the initiative and referendum processes to protect minority rights when needed, *see* David B. Magleby, *Let the Voters Decide? An Assessment of the Initiative and Referendum Process,* 66 U. Colo. L.Rev. 13, 40–42 (1995).

a voice in passing legislation. It must be remembered that SB 1110 only addresses qualifying for the ballot; once qualified, a proposition still requires a majority vote to pass. The Idaho Constitution's reservation of legislative power to the state's qualified voters—allowing them to pass or repeal legislation "independent of the legislature"—must also come with a fair opportunity to qualify an initiative or referendum for the ballot to exercise this power, or the power is merely illusory. The SOS and the Legislature have failed to demonstrate an interest compelling enough to justify the placing of such an onerous procedural hurdle on the proponents of an initiative or referendum before the majority ever gets to weigh-in on the issue.

The same is true of the rationale that SB 1110 was necessary to address concerns that the ballot might become "cluttered" with initiatives representing special interests. While we are mindful that California has had to contend with cluttered ballots,[14] Idaho's experience over the same period of time has been very different. We note first that, in the 109 years since the initiative and referendum power was created—88 years since the legislature passed enabling legislation— only 30 initiatives and seven referenda have ever made it onto the ballot. Only 28 initiatives and seven referenda qualified for the ballot in the 80 years (1933-2013)[15] when there was no geographic distribution requirement at all for gathering signatures. However, even if more initiatives and referenda qualified for the ballot in Idaho, the SOS and the Legislature would still have failed to establish that special interest "clutter" is a sufficient reason to limit fundamental rights.

In sum, the legislature has crafted a dramatic check on the ballot qualification process without showing a compelling need for such a check. Importantly, a thorough check is already built into the process: that every qualifying initiative or referenda is subject to a statewide, majority vote in which every qualified elector has an equal say. Thus, we conclude that the SOS and the Legislature have failed to demonstrate a compelling state interest justifying the restrictions in SB 1110.

    *2.*     *The requirement for signatures from all 35 legislative districts is not narrowly tailored.*

---

[14] According to data from the California Secretary of State's webpage, 392 initiatives have qualified for the ballot in California since 1912. *See* https://www.sos.ca.gov/elections/ballot-measures/resources-and-historical-information/history-california-initiatives .

[15] This includes the period in which the Ninth Circuit struck down Idaho's 22-county signature requirement for qualifying initiatives and referenda for the ballot. Technically, the 22-county geographic distribution requirement was in effect from 1997 to 2001, but no direct legislation made it to the ballot in those years.

Even if we were to accept, *arguendo*, the SOS and the Legislature's argument that there is a compelling state interest in demonstrating a "modicum of statewide support," we still cannot conclude that requiring signatures from 6% of registered voters in every one of the state's 35 legislative districts is narrowly tailored to achieve that goal. The statement of purpose to SB 1110 explains that it will accomplish its goals "by ensuring signatures are gathered from each of the 35 legislative districts, so every part of Idaho is included in the process." However, instead of crafting a narrow solution to address this concern, SB 1110 resolves it by placing an absolute veto power into the hands of any one legislative district in the state.

The SOS and the Legislature's argument is based on the unsupported assumption that a failure to gather enough signatures to qualify an initiative for the ballot in any one legislative district means that voters in the district do not support the initiative, or that there is not "a modicum of statewide support" for the initiative. There is little evidence to support such an inference. Medicaid Expansion is a salient example. In that case, organizers *qualified* the petition for the ballot without relying on signatures from districts in the middle of the state because the campaign was not required to do so. Yet, voters still passed the initiative by winning a majority of the vote in 35 of Idaho's 44 counties, amassing over 60% of the statewide vote. Moreover, even though many of the qualifying signatures were gathered where the state's population is more concentrated, the majority of the counties where the initiative passed were rural. Of course, Medicaid Expansion is only a single example. Yet, due to the relatively few initiatives that have passed in Idaho in recent years—only one has passed since 2002—the SOS and the Legislature have been unable to provide us with contrary evidence.

Instead of historic examples, the Legislature invokes the *possibility* of an extreme future scenario: If the 18-legislative-district requirement for signatures remains in effect, organizers *could* qualify an initiative or referendum by gathering signatures from only four populous counties—Ada, Canyon, Kootenai, and Bonneville—which alone currently encompass 18 legislative districts. Yet, such a scenario has never occurred. In the most recent initiative campaigns, both Medicaid Expansion and Horse Racing proponents ran extremely efficient and organized campaigns, with Medicaid Expansion relying on regional networks of volunteers, and Horse Racing deploying paid signature gatherers. To qualify for the ballot, Medicaid Expansion gathered signatures from 6% of registered voters in 26 counties; Horse Racing did the same in approximately 20 counties. Although these are only two limited, but recent, examples, in neither

of these well-run campaigns did the petition organizers qualify their initiatives for the ballot by obtaining signatures from only four counties.

However, again assuming, *arguendo*, that the Legislature's scenario was realized—an initiative qualified for the statewide ballot by garnering signatures from only Ada, Canyon, Kootenai, and Bonneville counties—it would still not mean that the initiative did not represent a diverse array of statewide interests. Although Ada and Canyon County are adjacent to one another in the southwest region of the state, Canyon County is decidedly more rural and politically distinguishable from Ada County. There, the population centers of Nampa and Caldwell serve largely rural interests. Even Ada County, which is home to Idaho's most populous city, Boise, with approximately 228,000 people as of the last census,[16] includes large tracts of rural land and more than 1,300 farms comprising more than 112,000 acres in 2017.[17] Importantly, notwithstanding the population of Boise, the SOS and the Legislature have failed to show that the political interests of Ada County as a whole are consistent with those of Boise. Similarly, Bonneville County, outside of Idaho Falls and Ammon, is indisputably a large rural county. The Legislature casts Idaho Code section 34-1805(2) as necessary to ensure that a diversity of interest, such as urban and rural voters, can weigh-in on a proposed initiative. However, even based on just these four counties, the reality is that counties with large "urban" centers in Idaho also contain significant amounts of agricultural land and have diverse and unique political makeups. Thus, the interests of the voters in these four counties are more grayscale than black or white.

The Legislature also claims it must protect against one region of the state dominating the rest with its local agenda. Yet, the four counties in their example could not be more geographically, culturally, and economically diverse. Kootenai County is in the state's panhandle, about 400 miles north from Boise and borders the State of Washington, while Bonneville County is about 300 miles east of Boise on the state's southeastern border with Wyoming. Ada County and Canyon County are both near Idaho's southwestern border with Oregon. If an organizer somehow qualified a ballot proposition by obtaining signatures from legislative districts in only these four counties, the signatures would have to come from voters in three far-flung corners of the state, representing

---

[16] According to current U.S. Census data, the City of Boise has a population of 228,965. https://data.census.gov/cedsci/profile?g=1600000US1608830 .

[17] *See* U.S. Dep't. of Agric., 2017 Census of Agriculture, Idaho State and County Data (April 2019), https://www.nass.usda.gov/Publications/AgCensus/2017/Full_Report/Volume_1,_Chapter_2_County_Level/Idaho/idv1.pdf .

varied regional interests, including both urban and rural interests, and spanning two time zones. This would certainly suggest a "modicum of statewide support" for the proposition. Moreover, we reiterate that the initiative and referendum processes come with a protection against local provincialism already built in: the requirement that direct legislation must be passed by a majority vote at the polls in November.

Interestingly, the SOS also argues that the new 35-legislative-district requirement is not impossible to satisfy because, due to the way legislative districts overlay counties, sponsors of initiative and referenda would only need to gather signatures "in about a third of Idaho's 44 counties (14 of 44)" and that "[s]carcely populated counties need not be visited." Of course, this only emphasizes the SOS and the Legislature's logical dilemma: on the one hand, they argue interests across the state must be represented; on the other hand, they argue that SB 1110 would require signatures from only 14 counties in the state. At best, it looks as though the Legislature has devised a requirement that nearly doubles the previous threshold—from 18 to 35 legislative districts—while also claiming that it would not affect anyone very much.

Rather than evenly distributing power across the state, the Legislature has achieved just the opposite. By requiring a threshold of support from every legislative district in the state, the Legislature has essentially given every legislative district veto power over qualifying initiatives and referenda for the ballot. While this might theoretically assure that voters with minority interests will have a voice, it will achieve this end at a terrible cost. For example, a lone urban district in Boise could thwart an agricultural initiative with strong statewide support. Likewise, a paid special interest lobby could derail a popular initiative it dislikes by focusing its opposition efforts on a single legislative district with which it shares common interests. Indeed, the consequences of this would be felt across the political spectrum as the respective strengths of a majority or minority group ebbs and flows over time. In sum, rather than protecting the interests of minority voters, in reality the Legislature has given minority voters an effective veto over the will of the majority of voters.

If the Legislature's actual goal is to prevent any initiative or referendum from qualifying for the ballot, then this is probably an effective tactic. However, this is inconsistent with the constitutional requirement of a "narrowly drawn" solution. *Rudeen*, 136 Idaho at 570, 38 P.3d at 608. If the goal were to assure that all voters across the state have a voice, the Legislature has done this in a way that is devoid of *any* tailoring at all. Ultimately, the effect of SB 1110 is to prevent a

perceived, yet *unsubstantiated* fear of the "tyranny of the majority," by replacing it with an *actual* "tyranny of the minority." This would result in a scheme that squarely conflicts with the democratic ideals that form the bedrock of the constitutional republic created by the Idaho Constitution,[18] and seriously undermines the people's initiative and referendum powers enshrined therein.

The SOS and the Legislature have argued that if statewide voters do not agree with the Legislature's policies, and cannot garner sufficient signatures to qualify an initiative or referendum for the ballot, the proper recourse is to elect different legislators. While it is true that the biennial election cycle affords the people one way to exercise their voting power to influence legislation, this is hardly a panacea when it comes to statewide issues—the people in one portion of the state have no ability to vote out a powerful legislator from another. More importantly, this argument ignores the fact that the people of Idaho have reserved to themselves an additional constitutional mechanism for affecting statewide policy and correcting legislative enactments they do not support—the initiative and referendum process. This power is meaningless unless it is accessible. Just as the Idaho Constitution protects the people's right to either reelect their legislators or elect new ones at the polls, it also protects the right to approve or reject a proposed initiative or referendum at the polls. It is not the proper role for any branch of the government to effectively nullify a constitutional mechanism reserved by the people to effect policy.

In sum, Idaho Code section 34-1805(2) violates Article III, Section 1 of the Idaho Constitution because the SOS and the Legislature have failed both tests under strict scrutiny: (1) they have not shown that there is a compelling state interest in demonstrating support from *every* legislative district before voter initiated legislation or referenda are allowed to appear on the ballot, and (2) they have failed to demonstrate that requiring signatures from all 35 legislative districts is a narrowly tailored way of achieving the goal of protecting the interests of rural or regional voters.

### 3. *The previous version of Idaho Code section 34-1805 is restored.*

Reclaim and the Committee ask this Court to strike the entire geographic requirement from Idaho Code section 34-1805. However, section 34-1805(2)'s 35-district requirement replaced a previous version of the statute with an 18-district requirement, and Reclaim and the Committee

---

[18] *See* U.S. CONST. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, . . ."); Idaho Admission Bill, 26 Stat. L. 215, ch. 656 (July 3, 1890) ("[The Idaho] Constitution is republican in form, and is in conformity with the Constitution of the United States."); *Reynolds v. Sims*, 377 U.S. 533, 566 (1964) (Acknowledging the "democratic ideals of equality and majority rule.").

41

have not directly challenged the constitutionality of that previous legislation. Because there is no emergency cited that would warrant the Court exercising its original jurisdiction to deal with a statute which has been in effect for at least eight years, we deny Reclaim and the Committee's request to hold Idaho Code section 34-1805 unconstitutional as it existed prior to the 2021 amendments. Thus, the proper remedy is to restore the previous version of the statute with its 18-district requirement.

The Idaho Supreme Court, in *American Independent Party in Idaho, Inc. v. Cenarrusa*, 92 Idaho 356, 442 P.2d 766 (1968), considered the constitutionality of a statute that increased the signature requirement for qualifying new political parties. In holding that the amended statute was unconstitutional because it would make organizing a new political party "a practical impossibility," this Court held that the previous version of the statute "remain[ed] in full force and effect":

> When a statute by express language repeals a former statute and attempts to provide a substitute therefor, which substitute is found to be unconstitutional, the repeal of the former statute is of no effect, unless it clearly appears that the legislature intended the repeal to be effective even though the substitute statute were found invalid.

*Id.* at 359, 442 P.2d at 769 (internal citations omitted).

For the reasons outlined herein, we have declared SB 1110 unconstitutional and granted Reclaim and the Committee's petition for a writ of prohibition barring its taking effect. Accordingly, Idaho Code section 34-1805 is restored to its previous state, whereby an initiative or referendum petition filed with the Secretary of State must include signatures from 6% of qualified electors at the time of the last general election in 18 legislative districts, provided the total number of signatures is equal to or greater than 6% of the registered voters in the state at the time of the last general election.

In so ruling, we clarify that we have not decided the question of whether section 34-1805, with its 18 legislative district requirement, is also unconstitutional. Accordingly, we deny this claim for relief without prejudice.

**D.      Idaho Code section 34-1813(2)(a), which requires all voter-approved initiatives to take effect no sooner than July 1 of the following year, is also unconstitutional.**

In 2020, the legislature amended Idaho Code section 34-1813 to include a provision that no initiative may take effect until July 1 of the year following the election in which it was approved:

A statewide initiative may contain an effective date, if passed, that shall be no earlier than July 1 of the year following the vote on the ballot initiative. If no effective date is specified in the petition, the effective date of a statewide initiative that has been approved by the electorate shall be July 1 of the following year.

I.C. § 34-1813(2)(a). Similar to the 2021 amendments to section 34-1805(2), Reclaim and the Committee argue that this provision is unconstitutional. We agree.

Reclaim and the Committee claim that the constitutional right reserved to the people to legislate directly by initiative in Article III, Section 1 of the Idaho Constitution is expressly "independent of the legislature," which means the legislature has no authority to set the effective date for initiative based legislation. For support, they cite previous case law in which this Court reasoned that, once passed, initiative laws stand on "equal footing" with laws passed by the legislature. *See Westerberg v. Andrus*, 114 Idaho 401, 404, 757 P.2d 664, 667 (1988) (citing *Luker*, 64 Idaho at 706, 136 P.2d at 979).

The Legislature has the power to declare that its legislation is an emergency, which allows the legislation to have immediate effect. *See Idaho State AFL-CIO v. Leroy*, 110 Idaho 691, 698, 718 P.2d 1129, 1136 (1986). To this end, Reclaim and the Committee aver that the people have a commensurate right to place an effective date into the legislation the people pass. Accordingly, they argue that, because Idaho Code section 34-1813(2)(a) intrudes upon that right, it violates the people's independent legislative power under Article III, Section 1 of the Idaho Constitution. Critically, they contend that, "[t]he only conceivable purpose [the Legislature] could have in imposing a blanket requirement of a July 1 or later effective date— some eight months after passage—is to give itself the opportunity to repeal a successful initiative in the session before July 1." Thus, they ask this Court to issue a writ prohibiting state officials from enforcing the effective date language in Idaho Code section 34-1813(2)(a).

In response, the SOS states that the effective date of legislation is a procedural matter and, therefore, within the purview of the legislature's conditions and manner authority under Article III, Section 1. Again, the SOS argues that "independent of the legislature" language of the Constitution only allows the people to determine the subject matter of the legislation but does not create independence in the legislative process. Further, the SOS argues there are practical considerations in "setting a consistent default effective date for all initiatives . . . ." To some extent, these echo the very concerns described by Reclaim and the Committee: that the Legislature does not wish to have legislation take immediate effect so they can repeal it in

the next legislative session. The SOS notes that most legislation in Idaho does not include an effective date, and that July 1 is the default date, unless another effective date is included. Generally, legislation does not go into effect sooner than 60 days after it is passed, except in case of an emergency. However, it is also true that legislation *may* contain a different effective date.

Article III, Section 22, of the Idaho Constitution states: "No act shall take effect until sixty days from the end of the session at which the same shall have been passed, except in case of emergency, which emergency shall be declared in the preamble or in the body of the law." Thus, the same standard, which allows the legislature considerable discretion in setting the effective date of legislation when an emergency is properly declared, should apply to legislation adopted by the people via the initiative process. Although the SOS argues that the effective date is merely procedural, we conclude that it crosses over into the substantive right reserved to the people. Article III, Section 1 provides that the people reserve to themselves the "power to *propose* laws, and *enact* the same at the polls *independent of the legislature*." Notably, "independent of the legislature" applies to both the power to propose laws and the power to *enact* laws. This necessarily includes the power to set the effective date, by which the laws are actually enacted.

In *Luker*, we held that initiative-based legislation was subject to amendment and repeal by the legislature because, after the law is passed, the constitutional amendment that created the initiative right placed initiative legislation "on an equal footing" with other legislative acts. 64 Idaho at 706, 136 P.2d at 979. In other words, "[t]he power to legislate is . . . derived from the same source." *Id.* As noted previously, we reaffirm our prior holdings that initiative-created legislation stands on equal footing with laws enacted by the legislature.[19] We conclude that this necessarily includes permitting the drafters of initiatives to set effective dates, subject to the requirements in Article III, Section 22, of the Idaho Constitution. To read Article III, Section 1 otherwise would disregard that the people may enact legislation "independent of the

---

[19] In *Luker*, this Court made two misstatements in its description of the legislative power in Idaho, which we now disavow. First, we wrote that the government was divided into three departments, "the first and foremost of which is the legislative power" vested in the Senate and House of Representatives. *Id.* (citing IDAHO CONST. art. III, § 1). We have since consistently emphasized that the three departments—the legislative, the executive, and the judiciary—are co-equal. Second, we described the 1912 constitutional amendment that reserved the initiative and referendum powers to the people as an "*afterthought*" and, thus, implied it was less important than other constitutional provisions. *Id.* (emphasis added). We recognize that many of the people's most important rights have come about by constitutional amendment, beginning with the Bill of Rights (Amendments I through X, inclusive), including the Thirteenth Amendment (abolishment of slavery) and the Twentieth Amendment (the recognition of women's suffrage). We disclaim any language that implies a right created by constitutional amendment is of lesser importance.

legislature." Therefore, we conclude that the amendments to Idaho Code section 34-1813(2)(a) are an unconstitutional infringement on the peoples' right to legislate independent of the legislature.

## VI.   ATTORNEY FEES UNDER THE PRIVATE ATTORNEY GENERAL DOCTRINE

Reclaim and the Committee request an award of attorney fees under the private attorney general doctrine. Three factors are to be considered under this doctrine:

> (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, (3) the number of people standing to benefit from the decision.

*Ada Cnty. v. Red Steer Drive-Ins of Nevada, Inc.*, 101 Idaho 94, 100, 609 P.2d 161, 167 (1980) (citing *Serrano v. Priest*, 569 P.2d 1303, 1314 (Cal. 1977)). In *Smith v. Idaho Comm'n on Redistricting*, 136 Idaho 542, 546, 38 P.3d 121, 125 (2001), we held that the private attorney general doctrine was applicable, even without a factual record, where petitioners "pursued the vindication of [a] right vigorously and the pursuit of such benefited a large number of Idahoans."

Reclaim and the Committee likewise assert that theirs is exactly the kind of case for which the doctrine was created: one pursued to protect the public and uphold the Idaho Constitution. Further, they note that no one from the public sector was able to effectively challenge the statute. Because the Attorney General's Office was charged with advising and representing the state officials who created the legislation at issue, and they ultimately represented the SOS in this action, there was no public entity available to protect the people's rights that Reclaim and the Committee defended. Thus, private enforcement was their only alternative. Additionally, the Legislature intervened to defend the contested legislation, using taxpayer funds to do so. Finally, Reclaim and the Committee's efforts in vindicating the people's constitutional right to pass and repeal legislation potentially benefits every citizen of Idaho.

Therefore, under the circumstances unique to this case, we conclude that attorney fees are warranted under the private attorney general doctrine. The contested legislation constituted a grave infringement on the people's constitutional rights, making this matter vital to the public interest to people across Idaho. Accordingly, this Court grants attorney fees for Reclaim and the Committee, to be apportioned equally between the SOS and the Legislature, inasmuch as both were active in opposing the petition.

## VII.   CONCLUSION

For the reasons set forth herein, we dismiss Gilmore's petition because he lacks standing. However, Reclaim and the Committee have established standing for this Court to hear their petition, and we conclude that this Court should hear the petition as it presents possible constitutional violations, which have an urgent need for immediate determination. Because the challenged legislation does not raise a purely political question, it falls within this Court's fundamental responsibility to act in its original jurisdiction and pass on its constitutionality.

Regarding the merits of Reclaim and the Committee's petition, we grant the petition in part by declaring that section 34-1805(2) violates Article III, Section 1 of the Idaho Constitution because the initiative and referendum powers are fundamental rights, reserved to the people of Idaho, to which strict scrutiny applies. We conclude that the SOS and the Legislature have failed to present a compelling state interest for limiting that right. Additionally, even if there were a compelling state interest, the Legislature's solution is not a narrowly tailored one. Therefore, we also grant the petition for a writ of prohibition barring SB 1110 from taking effect. However, we deny without prejudice the request to further strike the geographic distribution requirement in the previous statute. Instead, we restore the previous version of section 34-1805, which requires signatures from 6% of the qualified electors at the time of the last general election in each of at least 18 legislative districts, as well as signatures equal to or greater than 6% of the qualified electors in the state at the time of the last general election.

We further declare that section 34-1813(2)(a), which allows the legislature to set the effective date for initiatives as July 1 of the year following passage, violates Article III, Section 1 of the Idaho Constitution because it infringes on the people's reserved power to enact legislation independent of the legislature. Accordingly, we grant Reclaim and the Committee's petition for a writ of prohibition preventing the Secretary of State from enforcing this provision.

As the prevailing parties, Reclaim and the Committee are awarded their reasonable attorney fees under the private attorney general doctrine. Likewise, they are further entitled to recover their costs as a matter of course.

Chief Justice BEVAN and Justice BURDICK CONCUR.


STEGNER, J., specially concurring.

I concur with the ultimate holding and reasoning of the majority in its resolution of the claims of Reclaim and the Committee. I agree with my colleagues that Idaho Code sections 34-

46

1805(2) (2021) and 34-1813(2)(a) (2020) constitute unconstitutional attempts by the Legislature to limit the people's ability to enact and repeal legislation "independent of the legislature." IDAHO CONST. art. III, § 1. However, I write to explain my disagreement with my colleagues' analysis regarding Gilmore's standing, or rather, lack of standing. I feel no need to dissent because the determination that Gilmore lacks standing "does not affect the outcome of the instant appeal." *Glengary-Gamlin Protective Ass'n v. Bird,* 106 Idaho 84, 87, 675 P.2d 344, 347 (Ct. App. 1983). The question of Gilmore's standing is therefore unimportant to the ultimate resolution of these cases as the claims of Reclaim and the Committee are coterminous with Gilmore's.

This concurrence begins with an analysis of our state constitution. The Idaho Constitution guarantees that "[c]ourts of justice shall be open to *every person*, and a speedy remedy afforded for *every injury of person, property or character*, and right and justice shall be administered without sale, denial, delay, or prejudice." IDAHO CONST. art. I, § 18 (italics added). Considering this guarantee—and the noticeable absence of a "case or controversy" requirement in the Idaho Constitution—use of the federal standing framework in Idaho is not only legally unsound, but constitutionally incorrect.

This Court is not bound by the "case" or "controversy" language contained in the United States Constitution.[1] The "case or controversy" language presents a jurisdictional requirement applicable only to federal courts; federal courts are courts of limited jurisdiction, and can only hear cases they have been granted jurisdiction to hear. *Gunn v. Minton*, 568 U.S. 251, 256 (2013); *see also* U.S. CONST. art III, § 2. In dramatic contrast, state courts are courts of *general* jurisdiction. *See, e.g.*, *McCormick v. Smith*, 23 Idaho 487, 489, 130 P. 999, 1001 (1913) ("Unless the jurisdiction conferred by the Constitution and laws of the United States upon the federal courts is made exclusive of the state courts, *state courts retain jurisdiction of all actions wherein they are competent to take jurisdiction under their own laws*.") (italics added); *see also* IDAHO CONST. art. V, § 20 ("The district court shall have original jurisdiction *in all cases*, both at law and in equity,

---

[1] This Court observed in *Bear Lake Educational Association, by and through Belnap v. Board of Trustees of Bear Lake School District No. 33*, 116 Idaho 443, 448, 776 P.2d 452, 457 (1989), that "some elements of standing in the federal system are colored by the constitutional requirements of a 'case' or 'controversy[.]'" However, it appears that subsequently, the federal standing framework was wholly adopted without any such qualifying language. *See, e.g.*, *Miles v. Idaho Power Co.*, 116 Idaho 635, 641, 778 P.2d 757, 763 (1989) (referring to "the case or controversy requirement of standing"). Twenty-five years later, in *Coeur d'Alene Tribe v. Denney*, the Court acknowledged that the Idaho Constitution contains no analogous provision requiring a "case or controversy[,]" but described adoption of the federal standard as a "self-imposed constraint adopted from federal practice[.]" 161 Idaho 508, 513, 387 P.3d 761, 766 (2015). No additional explanation has ever been provided.

and such appellate jurisdiction as may be conferred by law.") (Italics added.) In other words, the starting premise in state court is inclusion and a presumption of jurisdiction, as opposed to exclusion and the opposite presumption.

Moreover, federal standing jurisprudence is rooted in a federal constitutional provision which has no equivalent in the Idaho Constitution. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("Though some of [the federal standing] elements express merely prudential considerations that are part of judicial self-government, the core component of [federal] standing is an essential and unchanging part of the case-or-controversy requirement of Article III."); *compare* U.S. CONST. art III, § 2, *with* IDAHO CONST. art. V (generally). In the words of the United States Supreme Court: "[T]he constraints of Article III [of the federal constitution] do not apply to state courts, and accordingly *the state courts are not bound by the limitations of a case or controversy or other federal rules of justiciability* even when they address issues of federal law[.]" *ASARCO Inc. v. Kadish*, 490 U.S. 605, 617 (1989) (italics added).

Notwithstanding this fact, the Idaho appellate courts began employing the federal standing framework in the 1980s without explanation. *See, e.g.*, *Glengary-Gamlin Protective Ass'n, Inc.*, 106 Idaho at 87, 675 P.2d at 347. Significantly, "none of the cases [utilizing the federal standing framework] have ever tried to reconcile or explain the 'case or controversy' requirement in the federal constitution to any provision in the Idaho Constitution, Idaho statute, or Idaho common law." *Zeyen v. Pocatello/Chubbuck Sch. Dist. No. 25*, 165 Idaho 690, 706, 451 P.3d 25, 41 (2019) (Stegner, J., dissenting).

This Court remains in the small minority of states that do not meaningfully distinguish between sources of state and federal standing. Most states acknowledge the distinction "between the structure of the state and federal courts, and avoid adopting federal doctrine without regard to their own precedent or circumstances." Wyatt Sassman, *A Survey of Constitutional Standing in State Courts*, 8 KY. J. EQUINE, AGRIC. & NAT. RESOURCES L. 349, 398 (2016). Results vary widely in those states that have grappled with the issue. Some states retain very loose standing frameworks that are heavily context-dependent.[2] Other states' frameworks have more shape, but emphasize the

---

[2] *Roop v. City of Belfast*, 915 A.2d 966 (Me. 2007) ("Unlike the language of article III, section 2 of the United States Constitution, the Maine Constitution contains no 'case or controversy' requirement. Therefore, '[o]ur standing jurisprudence is prudential, rather than constitutional.' The basic premise underlying the doctrine of standing is to 'limit access to the courts to those best suited to assert a particular claim.' There is no set formula for determining standing.") (citations omitted); *Foley-Ciccantelli v. Bishop's Grove Condominium Ass'n, Inc.*, 797 N.W. 2d 789, 799 (Wis. 2011) (identifying "three aspects of standing[:] the personal interest, the adverse effect, and judicial policy").

state's liberal approach to standing.[3] Still other states reduce standing to the existence of a "real" or "actual controversy,"[4] or rely on the existence and source of the legal cause of action to determine whether a plaintiff has standing.[5] Other states consider the federal standing framework to be persuasive and adopt it in part or wholesale as a matter of judicial policy, prudence, or restraint, or as a result of another state constitutional mandate.[6] Wherever these states ultimately arrived on standing, however, the core reasoning is the same: the state constitution does not contain the same limitations as the U.S. Constitution, and the state is free to set its own standing requirements.

Our neighbors in Oregon and Utah have both expressly rejected the federal framework for standing because there is no state constitutional equivalent of the "case or controversy" requirement,[7] with the Oregon Supreme Court writing:

> [W]e cannot import federal law regarding justiciability into our analysis of the Oregon Constitution and rely on it to fabricate constitutional barriers to litigation with no support in either the text or history of Oregon's charter of government.
>
> As former Justice Linde of this court has explained:

---

[3] *See*, *e.g.*, *State v. Quitman Cnty.*, 807 So.2d 401, 405 (Miss. 2001); *Jenkins v. Swan*, 675 P.2d 1145, 1149 (Utah 1983); *Crescent Park Tenants Ass'n v. Realty Equities Corp. of New York*, 275 A.2d 433, 437–38 (N.J. 1971).

[4] *See Dep't of Revenue v. Kuhnlein*, 646 So.2d 717, 720–21 (Fla. 1994) (requiring a "real controversy"); *Goldston v. State*, 637 S.E.2d 876, 882 (N.C. 2006) (requiring an "actual controversy").

[5] *Grosset v. Wenaas*, 175 P.3d 1184 (Cal. 2008) (referring to the statutory cause of action in determining whether a plaintiff has a cause of action); *Lansing Schools Educ. Ass'n v. Lansing Bd. of Educ.*, 792 N.W.2d 686, 696 (Mich. 2010); *Stockmeier v. Nevada Dep't of Corrs. Psychological Review Panel*, 135 P.3d 220, 225 (Nev. 2006), abrogated on other grounds by *Buzz Stew, LLC v. City of North Las Vegas*, 181 P.3d 670 (Nev. 2008) (examining whether statute giving rise to suit at bar provided standing to sue); *Kellas v. Dep't of Corrs.*, 145 P.3d 139, 142 (Or. 2006) ("The source of law that determines that question is the statute that confers standing in the particular proceeding that the party has initiated, 'because standing is not a matter of common law but is, instead, conferred by the legislature.'") (quoting *Local No. 290 v. Dep't of Environ. Quality*, 919 P.2d 1168 (Or. 1996)).

[6] *Sierra Club v. Dep't of Transp.*, 167 P.3d 292, 312 (Haw. 2007) (acknowledging borrowed justiciability requirements from federal framework "based on this court's prudential rules of judicial self-governance"); *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995); *ACLU of New Mexico v. City of Albuquerque*, 188 P.3d 1222, 1226–27 (N.M. 2008) ("'While we recognize that standing in our state courts does not have the constitutional dimensions that are present in federal court, New Mexico's standing jurisprudence indicates that our state courts have long been guided by the traditional federal standing analysis."); *Hous. Auth. of Cnty. of Chester v. Pennsylvania State Civ. Serv. Comm'n*, 730 A.2d 935, 941 (Pa. 1999) (acknowledging distinction between federal and state standing frameworks, but only examining statutory source of standing when federal framework not met); *Norma Faye Pyles Lynch Family Purpose LLC v. Putnam Cnty.*, 301 S.W.3d 196, 202–03 (Tenn. 2009).

[7] *See Jenkins*, 675 P.2d at 1149 ("[N]o similar requirement exists in the Utah Constitution. We previously have held that 'this Court may grant standing where matters of great public interest and societal impact are concerned.' However, the requirement that the plaintiff have a personal stake in the outcome of a legal dispute is rooted in the historical and constitutional role of the judiciary in Utah."); *see also Couey v. Atkins*, 355 P.3d 866, 885 (Or. 2015) ("Neither of the judicial-power provisions was patterned after the judicial-power provisions of the federal constitution, which expressly limited the exercise of judicial power by federal courts to specifically enumerated categories of 'cases' and 'controversies.' To the contrary, the constitution vested '*[a]ll judicial power*' in the courts, without limitation or qualification.") (italics in original).

"In sum, rejecting premature or advisory litigation is good policy, but rigid tests of 'justiciability' breed evasions and legal fictions. It is prudent to keep judicial intervention within statutory or established equitable and common law remedies. It is not prudent to link a decision declining adjudication to non-textual, self-created constitutional barriers, and thereby to foreclose lawmakers from facilitating impartial, reasoned resolutions of legal disputes that affect people's public, rather than self-seeking, interests. Requirements that rest only on statutory interpretations can be altered to meet desired ends, but change becomes harder once interpretations are elevated into supposedly essential doctrines of 'justiciability.'"

*Kellas v. Dep't of Corrs.*, 145 P.3d 139, 143 (Or. 2006) (quoting Hans A. Linde, *The State and the Federal Courts in Governance: Vive La Différence!* 46 WM. & MARY L. REV. 1273, 1287–88 (2005)).

Blind adoption of the federal framework is not only legally unsound, but more importantly, it is a fundamental rejection of Idaho's unique judicial power and constitutional guarantee. I again urge my colleagues to address this issue. I recognize that leaving behind thirty years of jurisprudence on standing is a significant departure from our recent jurisprudence. However, the trek back to the true course—the *Idaho* constitution—will be shorter if begun now. It is never too late to correct a mistake. Only then can Idaho's courts truly satisfy the mandate of our state constitution: "Courts of justice shall be open to every person, and a speedy remedy afforded for every injury of person, property or character, and right and justice shall be administered without sale, denial, delay, or prejudice." IDAHO CONST. art. I, § 18. Notwithstanding my disagreement with this Court's analysis regarding Gilmore's standing, I concur.

BRODY, J., concurring in part and dissenting in part.

I concur with the Court's conclusion that SB 1110 is unconstitutional. I dissent from subsections III.B and III.C of the opinion where the Court adopts and applies strict scrutiny to invalidate the law. I would hold that SB 1110 is unconstitutional because it is not "reasonable and workable" under the standard articulated by the Court in *Dredge Mining Control-Yes!*, *Inc. v. Cenarrusa*, 92 Idaho 480, 484, 445 P.2d 655, 659 (1968). I otherwise concur and join the other portions of the Court's opinion.

Standards of review matter. Strict scrutiny is the most exacting standard of constitutional review. It takes the usual presumption—that legislation is constitutional unless those opposing it

can prove otherwise, *see Olsen v. J.A. Freeman Co.*, 117 Idaho 706, 709, 791 P.2d 1285, 1288 (1990)—and turns it on its head. Strict scrutiny presumes legislation is *un*constitutional unless the government can prove otherwise by establishing it is necessary to further a compelling interest. *Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 126, 15 P.3d 1129, 1134 (2000).

In this case, the Court holds that strict scrutiny must apply because the referendum and initiative rights are fundamental:

> "We have already concluded that, just like the right to vote, the people's right to legislate is expressed as a positive right in the Idaho Constitution and is, therefore, fundamental. Our fundamental rights analysis is unequivocal that such rights are subject to strict scrutiny, and that is the standard we must apply here."

*Must*? We *must* apply strict scrutiny when the Idaho Constitution expressly grants the legislature the authority to regulate the conditions and manner in which the people exercise their initiative and referendum rights? In other words, we *must* presume the legislature has acted unconstitutionally, absent proof to the contrary, when it does what the constitution says it may do? This cannot be so.

I understand our Court has typically applied strict scrutiny in cases impacting fundamental rights. I disagree, however, with following that tradition here. The Court needs only look as far as the decision in *Van Valkenburgh v. Citizens for Term Limits*, 135 Idaho 121, 15 P.3d 1129 (2000)—the case it cites for the proposition that strict scrutiny applies—to see that a reflexive application of the standard is unwarranted. Specifically, in finding strict scrutiny applied, the Court distinguished the circumstances of *Van Valkenburgh* from those of *Burdick v. Takushi*, 504 U.S. 428 (1992), a decision that limns the fallacies in the Court's application of strict scrutiny here.

In *Burdick*, a registered voter from Hawaii wanted to vote for a write-in candidate in the primary and general elections. 504 U.S. at 430. He was informed by state officials that there was no provision for write-in voting so he sued the state, arguing that the prohibition violated the First and Fourteenth Amendments of the United States Constitution. *Id.* The voter argued that strict scrutiny should be applied to the case because the prohibition involved the fundamental right to vote. *Id.* at 432. The United States Supreme Court soundly rejected his argument, holding that strict scrutiny would impermissibly tie the state's hands to regulate as expressly permitted by the Constitution:

> *Petitioner proceeds from the erroneous assumption that a law that imposes any burden upon the right to vote must be subject to strict scrutiny. Our cases do not so hold.*

It is beyond cavil that "voting is of the most fundamental significance under our constitutional structure." It does not follow, however, that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute. *The Constitution provides that States may prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives,"* Art. I, § 4, cl. 1, and the Court therefore has recognized that States retain the power to regulate their own elections. Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; "as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."

Election laws will invariably impose some burden upon individual voters. Each provision of a code, "whether it governs the registration and qualifications of voters, the selection and eligibility of candidates, or the voting process itself, inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Consequently, to subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest, as petitioner suggests, would tie the hands of States seeking to assure that elections are operated equitably and efficiently.* Accordingly, the mere fact that a State's system "creates barriers ... tending to limit the field of candidates from which voters might choose ... does not of itself compel close scrutiny."

504 U.S. at 432–34 (citations omitted) (emphasis added). After rejecting the petitioner's strict scrutiny argument, the *Burdick* Court went on to apply a more flexible balancing test articulated by the Court in *Anderson v. Celebrezze*, 460 U.S. 780, 782 (1983). *Burdick*, 504 U.S. at 433–34. Ultimately, it upheld Hawaii's prohibition on write-in voting. *Id.* at 441.

To be clear, I do not advocate for the application of what is now known as the *Anderson-Burdick* flexible balancing test that federal courts apply in federal voting cases. My point in raising *Burdick* is two-fold. First, *Burdick* illustrates that the application of strict scrutiny in a case involving fundamental rights is not always a given. And, second, the express provision in the United States Constitution which grants states the authority to set the time, place, and manner of voting for senators and representatives, necessitated a more deferential standard of review than strict scrutiny. The same logic applies here. Article III, section 1 of the Idaho Constitution grants the legislature the authority to set the conditions and manner for the exercise of referendum and initiative rights; good sense and the constitutional text necessitate a standard that lets it do so.

Over half a century ago, our Court articulated the standard that I would apply to this case in *Dredge Mining Control-Yes!, Inc. v. Cenarrusa*, 92 Idaho 480, 484, 445 P.2d 655, 659 (1968).

The Court's decision today does not convince me that we should jettison that precedent. It is true that the *Dredge Mining* court did not address strict scrutiny as a standard of review. In fact, the modern doctrine of strict scrutiny did not actually emerge until the late 1960s, about the time when *Dredge Mining* was decided. Richard H. Fallon, Jr., *Strict Judicial Scrutiny*, 54 UCLA L. Rev. 1267, 1284–85 (2007). That does not mean, however, that *Dredge Mining* has no precedential value as the Court seems to conclude.

The Court contends that *Dredge Mining* did not establish the standard of review applicable here because, instead of conducting a fundamental rights analysis, the Court was focused on an issue of statutory interpretation—whether the term "legal voter" in the version of Idaho Code section 34-1805 then in effect was synonymous with the term "qualified elector" in Article VI, section 2 of the Idaho Constitution. *See Dredge Mining* at 482–83, 445 P.2d at 657–58. To be sure, the *Dredge Mining* Court spent a lot of ink discussing this statutory interpretation issue. But it also squarely addressed what can only be read as a constitutional challenge to the signature verification requirements enacted by the legislature in connection with initiatives. Here was the assignment of error and the Court's summary of the arguments made by the proponent of the initiative:

> In its conclusions of law VI, the trial court stated:

> > 'The Legislature is charged with the duty of establishing a procedure whereby the people can place initiative matters on the ballot. The legislative procedures outlined in Chapter 18 of Title 34, Idaho Code, are not unreasonable and must be complied with. While they may be cumbersome they are nevertheless workable and if any changes are required therein, they should be promulgated by the Legislature and not by the Court.'

> *Appellant has assigned this conclusion as error and contends that the trial court should have concluded that the certification of signatures by the clerks of the various district courts was a practical impossibility under the Idaho voter registration laws.* The Idaho initiative law is nearly identical to that enacted by the Oregon legislature. Appellant contends that the requirement for certification of signatures by clerks of the courts in Oregon is workable under its election and registration laws, but that the same procedure is unworkable in Idaho because of differences in statutory enactments concerning the registration of voters.

92 Idaho at 483, 445 P.2d at 658 (emphasis added).

Right on the heels of this discussion, the Court recognized the people's constitutional right to initiative set forth in Article 3, section 1 and the legislature's authority to regulate that right:

> Idaho Const. Art. 3, § 1 reserves to the people the right to propose legislation by initiative, but only 'under such conditions and in such manner as may be

provided by acts of the legislature * * *.' This court has specifically held in *Johnson v. Diefendorf*, 56 Idaho 620, 57 P.2d 1068 (1936), that the right of referendum (also provided in Idaho Const. Art. 3, § 1) is not self-executing, but rather its exercise is dependent upon the statutory scheme enacted by the legislature. The legislature has established such a scheme by enactment of I.C. Title 34, Chapter 18.

*Id.* Then, after a discussion of how the signature verification process actually worked at the time, the Court upheld the signature verification requirements because they were "reasonable and workable":

*The statutory scheme set up by the legislature, although restrictive and perhaps cumbersome, is reasonable and workable.* Changes designed to make it less restrictive and burdensome in its operation are for the legislature to enact. The trial court did not err in its conclusion of law that the provisions of the law enacted by the legislature pertaining to the initiative procedures are reasonable.

*Dredge Mining Control-Yes!, Inc.*, 92 Idaho at 484, 445 P.2d at 659.

The bottom line is that the *Dredge Mining* Court squarely confronted the tension that exists between the people's right to an initiative and the legislature's authority to regulate that right. The Court resolved that tension by applying a "reasonable and workable" test and ultimately concluded that the signature verification requirements enacted by the legislature passed constitutional muster. This is the same test I would apply today. SB 1110 is not reasonable and workable. I agree wholeheartedly with the Court's conclusion that SB 1110 gives every legislative district in the state veto power and turns a perceived fear of "tyranny of the majority" into an actual "tyranny of the minority." I would invalidate SB 1110 on that ground.